# TWO PESOS, INC. *v.* TACO CABANA, INC.

No. 91–971.   Argued April 21, 1992—Decided June 26, 1992

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 776. STEVENS, J., *post*, p. 776, and THOMAS, J., *post*, p. 785, filed opinions concurring in the judgment.

*Kimball J. Corson* argued the cause and filed the briefs for petitioner.

*Richard G. Taranto* argued the cause for respondent. With him on the brief were *H. Bartow Farr III* and *James Eliasberg.**

JUSTICE WHITE delivered the opinion of the Court.

The issue in this case is whether the trade dress[1] of a restaurant may be protected under § 43(a) of the Trademark Act of 1946 (Lanham Act), 60 Stat. 441, 15 U. S. C. § 1125(a)

---

*\*Arthur M. Handler* and *Ronald S. Katz* filed a brief for the Private Label Manufacturers Association as *amicus curiae* urging reversal.

*Bruce P. Keller* filed a brief for the United States Trademark Association as *amicus curiae.*

[1] The District Court instructed the jury: "'[T]rade dress' is the total image of the business. Taco Cabana's trade dress may include the shape and general appearance of the exterior of the restaurant, the identifying sign, the interior kitchen floor plan, the decor, the menu, the equipment used to serve food, the servers' uniforms and other features reflecting on the total image of the restaurant." 1 App. 83–84. The Court of Appeals accepted this definition and quoted from *Blue Bell Bio-Medical* v. *Cin-Bad, Inc.,* 864 F. 2d 1253, 1256 (CA5 1989): "The 'trade dress' of a product is essentially its total image and overall appearance." See 932 F. 2d 1113, 1118 (CA5 1991). It "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *John H. Harland Co.* v. *Clarke Checks, Inc.,* 711 F. 2d 966, 980 (CA11 1983). Restatement (Third) of Unfair Competition § 16, Comment *a* (Tent. Draft No. 2, Mar. 23, 1990).

(1982 ed.), based on a finding of inherent distinctiveness, without proof that the trade dress has secondary meaning.

## I

Respondent Taco Cabana, Inc., operates a chain of fast-food restaurants in Texas. The restaurants serve Mexican food. The first Taco Cabana restaurant was opened in San Antonio in September 1978, and five more restaurants had been opened in San Antonio by 1985. Taco Cabana describes its Mexican trade dress as

> "a festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme." 932 F. 2d 1113, 1117 (CA5 1991).

In December 1985, a Two Pesos, Inc., restaurant was opened in Houston. Two Pesos adopted a motif very similar to the foregoing description of Taco Cabana's trade dress. Two Pesos restaurants expanded rapidly in Houston and other markets, but did not enter San Antonio. In 1986, Taco Cabana entered the Houston and Austin markets and expanded into other Texas cities, including Dallas and El Paso where Two Pesos was also doing business.

In 1987, Taco Cabana sued Two Pesos in the United States District Court for the Southern District of Texas for trade dress infringement under § 43(a) of the Lanham Act, 15 U. S. C. § 1125(a) (1982 ed.),[2] and for theft of trade secrets

---

[2] Section 43(a) provides: "Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to de-

under Texas common law. The case was tried to a jury, which was instructed to return its verdict in the form of answers to five questions propounded by the trial judge. The jury's answers were: Taco Cabana has a trade dress; taken as a whole, the trade dress is nonfunctional; the trade dress is inherently distinctive;[3] the trade dress has not acquired a secondary meaning[4] in the Texas market; and the alleged infringement creates a likelihood of confusion on the part of ordinary customers as to the source or association of the restaurant's goods or services. Because, as the jury was told, Taco Cabana's trade dress was protected if it either was inherently distinctive or had acquired a secondary meaning, judgment was entered awarding damages to Taco Cabana. In the course of calculating damages, the trial court held that Two Pesos had intentionally and deliberately infringed Taco Cabana's trade dress.[5]

---

scribe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." 60 Stat. 441.

This provision has been superseded by § 132 of the Trademark Law Revision Act of 1988, 102 Stat. 3946, 15 U. S. C. § 1121.

[3] The instructions were that, to be found inherently distinctive, the trade dress must not be descriptive.

[4] Secondary meaning is used generally to indicate that a mark or dress "has come through use to be uniquely associated with a specific source." Restatement (Third) of Unfair Competition § 13, Comment e (Tent. Draft No. 2, Mar. 23, 1990). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 851, n. 11 (1982).

[5] The Court of Appeals agreed: "The weight of the evidence persuades us, as it did Judge Singleton, that Two Pesos brazenly copied Taco Cabana's successful trade dress, and proceeded to expand in a manner that

The Court of Appeals ruled that the instructions adequately stated the applicable law and that the evidence supported the jury's findings. In particular, the Court of Appeals rejected petitioner's argument that a finding of no secondary meaning contradicted a finding of inherent distinctiveness.

In so holding, the court below followed precedent in the Fifth Circuit. In *Chevron Chemical Co.* v. *Voluntary Purchasing Groups, Inc.*, 659 F. 2d 695, 702 (CA5 1981), the court noted that trademark law requires a demonstration of secondary meaning only when the claimed trademark is not sufficiently distinctive of itself to identify the producer; the court held that the same principles should apply to protection of trade dresses. The Court of Appeals noted that this approach conflicts with decisions of other courts, particularly the holding of the Court of Appeals for the Second Circuit in *Vibrant Sales, Inc.* v. *New Body Boutique, Inc.*, 652 F. 2d 299 (1981), cert. denied, 455 U. S. 909 (1982), that § 43(a) protects unregistered trademarks or designs only where secondary meaning is shown. *Chevron, supra,* at 702. We granted certiorari to resolve the conflict among the Courts of Appeals on the question whether trade dress that is inherently distinctive is protectible under § 43(a) without a showing that it has acquired secondary meaning.[6] 502 U. S. 1071 (1992). We find that it is, and we therefore affirm.

## II

The Lanham Act[7] was intended to make "actionable the deceptive and misleading use of marks" and "to protect per-

---

foreclosed several lucrative markets within Taco Cabana's natural zone of expansion." 932 F. 2d, at 1127, n. 20.

[6] We limited our grant of certiorari to the above question on which there is a conflict. We did not grant certiorari on the second question presented by the petition, which challenged the Court of Appeals' acceptance of the jury's finding that Taco Cabana's trade dress was not functional.

[7] The Lanham Act, including the provisions at issue here, has been substantially amended since the present suit was brought. See Trademark Law Revision Act of 1988, 102 Stat. 3946, 15 U. S. C. § 1121.

sons engaged in . . . commerce against unfair competition."
§ 45, 15 U. S. C. § 1127. Section 43(a) "prohibits a broader
range of practices than does § 32," which applies to regis-
tered marks, *Inwood Laboratories, Inc.* v. *Ives Laboratories,
Inc.*, 456 U. S. 844, 858 (1982), but it is common ground that
§ 43(a) protects qualifying unregistered trademarks and that
the general principles qualifying a mark for registration
under § 2 of the Lanham Act are for the most part applicable
in determining whether an unregistered mark is entitled to
protection under § 43(a). See *A. J. Canfield Co.* v. *Honick-
man*, 808 F. 2d 291, 299, n. 9 (CA3 1986); *Thompson Medical
Co.* v. *Pfizer Inc.*, 753 F. 2d 208, 215–216 (CA2 1985).

A trademark is defined in 15 U. S. C. § 1127 as including
"any word, name, symbol, or device or any combination
thereof" used by any person "to identify and distinguish his
or her goods, including a unique product, from those manu-
factured or sold by others and to indicate the source of the
goods, even if that source is unknown." In order to be reg-
istered, a mark must be capable of distinguishing the appli-
cant's goods from those of others. § 1052. Marks are often
classified in categories of generally increasing distinctive-
ness; following the classic formulation set out by Judge
Friendly, they may be (1) generic; (2) descriptive; (3) sugges-
tive; (4) arbitrary; or (5) fanciful. See *Abercrombie & Fitch
Co.* v. *Hunting World, Inc.*, 537 F. 2d 4, 9 (CA2 1976). The
Court of Appeals followed this classification and petitioner
accepts it. Brief for Petitioner 11–15. The latter three cat-
egories of marks, because their intrinsic nature serves to
identify a particular source of a product, are deemed inher-
ently distinctive and are entitled to protection. In contrast,
generic marks—those that "refe[r] to the genus of which the
particular product is a species," *Park 'N Fly, Inc.* v. *Dollar
Park & Fly, Inc.*, 469 U. S. 189, 194 (1985), citing *Abercrom-
bie & Fitch, supra*, at 9—are not registrable as trademarks.
*Park 'N Fly, supra*, at 194.

Marks which are merely descriptive of a product are not inherently distinctive. When used to describe a product, they do not inherently identify a particular source, and hence cannot be protected. However, descriptive marks may acquire the distinctiveness which will allow them to be protected under the Act. Section 2 of the Lanham Act provides that a descriptive mark that otherwise could not be registered under the Act may be registered if it "has become distinctive of the applicant's goods in commerce." §§ 2(e), (f), 15 U. S. C. §§ 1052(e), (f). See *Park 'N Fly, supra,* at 194, 196. This acquired distinctiveness is generally called "secondary meaning." See *ibid.; Inwood Laboratories, supra,* at 851, n. 11; *Kellogg Co.* v. *National Biscuit Co.,* 305 U. S. 111, 118 (1938). The concept of secondary meaning has been applied to actions under § 43(a). See, *e. g., University of Georgia Athletic Assn.* v. *Laite,* 756 F. 2d 1535 (CA11 1985); *Thompson Medical Co.* v. *Pfizer Inc., supra.*

The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning. Restatement (Third) of Unfair Competition § 13, pp. 37–38, and Comment *a* (Tent. Draft No. 2, Mar. 23, 1990). Cf. *Park 'N Fly, supra,* at 194. It is also clear that eligibility for protection under § 43(a) depends on nonfunctionality. See, *e. g., Inwood Laboratories, supra,* at 863 (WHITE, J., concurring in result); see also, *e. g., Brunswick Corp.* v. *Spinit Reel Co.,* 832 F. 2d 513, 517 (CA10 1987); *First Brands Corp.* v. *Fred Meyers, Inc.,* 809 F. 2d 1378, 1381 (CA9 1987); *Stormy Clime Ltd.* v. *ProGroup, Inc.,* 809 F. 2d 971, 974 (CA2 1987); *Ambrit, Inc.* v. *Kraft, Inc.,* 812 F. 2d 1531, 1535 (CA11 1986); *American Greetings Corp.* v. *Dan-Dee Imports, Inc.,* 807 F. 2d 1136, 1141 (CA3 1986). It is, of course, also undisputed that liability under § 43(a) requires proof of the likelihood of confusion. See, *e. g., Brunswick Corp., supra,* at 516–517; *AmBrit,*

*supra,* at 1535; *First Brands, supra,* at 1381; *Stormy Clime, supra,* at 974; *American Greetings, supra,* at 1141.

The Court of Appeals determined that the District Court's instructions were consistent with the foregoing principles and that the evidence supported the jury's verdict. Both courts thus ruled that Taco Cabana's trade dress was not descriptive but rather inherently distinctive, and that it was not functional. None of these rulings is before us in this case, and for present purposes we assume, without deciding, that each of them is correct. In going on to affirm the judgment for respondent, the Court of Appeals, following its prior decision in *Chevron,* held that Taco Cabana's inherently distinctive trade dress was entitled to protection despite the lack of proof of secondary meaning. It is this issue that is before us for decision, and we agree with its resolution by the Court of Appeals. There is no persuasive reason to apply to trade dress a general requirement of secondary meaning which is at odds with the principles generally applicable to infringement suits under § 43(a). Petitioner devotes much of its briefing to arguing issues that are not before us, and we address only its arguments relevant to whether proof of secondary meaning is essential to qualify an inherently distinctive trade dress for protection under § 43(a).

Petitioner argues that the jury's finding that the trade dress has not acquired a secondary meaning shows conclusively that the trade dress is not inherently distinctive. Brief for Petitioner 9. The Court of Appeals' disposition of this issue was sound:

> "Two Pesos' argument—that the jury finding of inherent distinctiveness contradicts its finding of no secondary meaning in the Texas market—ignores the law in this circuit. While the necessarily imperfect (and often prohibitively difficult) methods for assessing secondary meaning address the empirical question of current consumer association, the legal recognition of an inherently distinctive trademark or trade dress acknowledges the

owner's legitimate proprietary interest in its unique and valuable informational device, regardless of whether substantial consumer association yet bestows the additional empirical protection of secondary meaning." 932 F. 2d, at 1120, n. 7.

Although petitioner makes the above argument, it appears to concede elsewhere in its brief that it is possible for a trade dress, even a restaurant trade dress, to be inherently distinctive and thus eligible for protection under §43(a). Brief for Petitioner 10–11, 17–18; Reply Brief for Petitioner 10–14. Recognizing that a general requirement of secondary meaning imposes "an unfair prospect of theft [or] financial loss" on the developer of fanciful or arbitrary trade dress at the outset of its use, petitioner suggests that such trade dress should receive limited protection without proof of secondary meaning. Id., at 10. Petitioner argues that such protection should be only temporary and subject to defeasance when over time the dress has failed to acquire a secondary meaning. This approach is also vulnerable for the reasons given by the Court of Appeals. If temporary protection is available from the earliest use of the trade dress, it must be because it is neither functional nor descriptive, but an inherently distinctive dress that is capable of identifying a particular source of the product. Such a trade dress, or mark, is not subject to copying by concerns that have an equal opportunity to choose their own inherently distinctive trade dress. To terminate protection for failure to gain secondary meaning over some unspecified time could not be based on the failure of the dress to retain its fanciful, arbitrary, or suggestive nature, but on the failure of the user of the dress to be successful enough in the marketplace. This is not a valid basis to find a dress or mark ineligible for protection. The user of such a trade dress should be able to maintain what competitive position it has and continue to seek wider identification among potential customers.

This brings us to the line of decisions by the Court of Appeals for the Second Circuit that would find protection for trade dress unavailable absent proof of secondary meaning, a position that petitioner concedes would have to be modified if the temporary protection that it suggests is to be recognized. Brief for Petitioner 10–14. In *Vibrant Sales, Inc.* v. *New Body Boutique, Inc.*, 652 F. 2d 299 (1981), the plaintiff claimed protection under § 43(a) for a product whose features the defendant had allegedly copied. The Court of Appeals held that unregistered marks did not enjoy the "presumptive source association" enjoyed by registered marks and hence could not qualify for protection under § 43(a) without proof of secondary meaning. *Id.*, at 303, 304. The court's rationale seemingly denied protection for unregistered, but inherently distinctive, marks of all kinds, whether the claimed mark used distinctive words or symbols or distinctive product design. The court thus did not accept the arguments that an unregistered mark was capable of identifying a source and that copying such a mark could be making any kind of a false statement or representation under § 43(a).

This holding is in considerable tension with the provisions of the Lanham Act. If a verbal or symbolic mark or the features of a product design may be registered under § 2, it necessarily is a mark "by which the goods of the applicant may be distinguished from the goods of others," 60 Stat. 428, and must be registered unless otherwise disqualified. Since § 2 requires secondary meaning only as a condition to registering descriptive marks, there are plainly marks that are registrable without showing secondary meaning. These same marks, even if not registered, remain inherently capable of distinguishing the goods of the users of these marks. Furthermore, the copier of such a mark may be seen as falsely claiming that his products may for some reason be thought of as originating from the plaintiff.

Some years after *Vibrant*, the Second Circuit announced in *Thompson Medical Co.* v. *Pfizer Inc.*, 753 F. 2d 208 (1985),

that in deciding whether an unregistered mark is eligible for protection under § 43(a), it would follow the classification of marks set out by Judge Friendly in *Abercrombie & Fitch*, 537 F. 2d, at 9. Hence, if an unregistered mark is deemed merely descriptive, which the verbal mark before the court proved to be, proof of secondary meaning is required; however, "[s]uggestive marks are eligible for protection without any proof of secondary meaning, since the connection between the mark and the source is presumed." 753 F. 2d, at 216. The Second Circuit has nevertheless continued to deny protection for trade dress under § 43(a) absent proof of secondary meaning, despite the fact that § 43(a) provides no basis for distinguishing between trademark and trade dress. See, *e. g., Stormy Clime Ltd.* v. *ProGroup, Inc.,* 809 F. 2d, at 974; *Union Mfg. Co.* v. *Han Baek Trading Co.,* 763 F. 2d 42, 48 (1985); *LeSportsac, Inc.* v. *K mart Corp.,* 754 F. 2d 71, 75 (1985).

The Fifth Circuit was quite right in *Chevron,* and in this case, to follow the *Abercrombie* classifications consistently and to inquire whether trade dress for which protection is claimed under § 43(a) is inherently distinctive. If it is, it is capable of identifying products or services as coming from a specific source and secondary meaning is not required. This is the rule generally applicable to trademarks, and the protection of trademarks and trade dress under § 43(a) serves the same statutory purpose of preventing deception and unfair competition. There is no persuasive reason to apply different analysis to the two. The "proposition that secondary meaning must be shown even if the trade dress is a distinctive, identifying mark, [is] wrong, for the reasons explained by Judge Rubin for the Fifth Circuit in *Chevron." Blau Plumbing, Inc.* v. *S. O. S. Fix-It, Inc.,* 781 F. 2d 604, 608 (CA7 1986). The Court of Appeals for the Eleventh Circuit also follows *Chevron, Ambrit, Inc.* v. *Kraft, Inc.,* 805 F. 2d 974, 979 (1986), and the Court of Appeals for the Ninth Circuit appears to think that proof of secondary meaning is super-

fluous if a trade dress is inherently distinctive, *Fuddruckers, Inc.* v. *Doc's B. R. Others, Inc.*, 826 F. 2d 837, 843 (1987).

It would be a different matter if there were textual basis in § 43(a) for treating inherently distinctive verbal or symbolic trademarks differently from inherently distinctive trade dress. But there is none. The section does not mention trademarks or trade dress, whether they be called generic, descriptive, suggestive, arbitrary, fanciful, or functional. Nor does the concept of secondary meaning appear in the text of § 43(a). Where secondary meaning does appear in the statute, 15 U. S. C. § 1052 (1982 ed.), it is a requirement that applies only to merely descriptive marks and not to inherently distinctive ones. We see no basis for requiring secondary meaning for inherently distinctive trade dress protection under § 43(a) but not for other distinctive words, symbols, or devices capable of identifying a producer's product.

Engrafting onto § 43(a) a requirement of secondary meaning for inherently distinctive trade dress also would undermine the purposes of the Lanham Act. Protection of trade dress, no less than of trademarks, serves the Act's purpose to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation." *Park 'N Fly*, 469 U. S., at 198, citing S. Rep. No. 1333, 79th Cong., 2d Sess., 3–5 (1946) (citations omitted). By making more difficult the identification of a producer with its product, a secondary meaning requirement for a nondescriptive trade dress would hinder improving or maintaining the producer's competitive position.

Suggestions that under the Fifth Circuit's law, the initial user of any shape or design would cut off competition from

products of like design and shape are not persuasive. Only nonfunctional, distinctive trade dress is protected under § 43(a). The Fifth Circuit holds that a design is legally functional, and thus unprotectible, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection. See *Sicilia Di R. Biebow & Co. v. Cox*, 732 F. 2d 417, 426 (1984). This serves to assure that competition will not be stifled by the exhaustion of a limited number of trade dresses.

On the other hand, adding a secondary meaning requirement could have anticompetitive effects, creating particular burdens on the startup of small companies. It would present special difficulties for a business, such as respondent, that seeks to start a new product in a limited area and then expand into new markets. Denying protection for inherently distinctive nonfunctional trade dress until after secondary meaning has been established would allow a competitor, which has not adopted a distinctive trade dress of its own, to appropriate the originator's dress in other markets and to deter the originator from expanding into and competing in these areas.

As noted above, petitioner concedes that protecting an inherently distinctive trade dress from its inception may be critical to new entrants to the market and that withholding protection until secondary meaning has been established would be contrary to the goals of the Lanham Act. Petitioner specifically suggests, however, that the solution is to dispense with the requirement of secondary meaning for a reasonable, but brief, period at the outset of the use of a trade dress. Reply Brief for Petitioner 11–12. If § 43(a) does not require secondary meaning at the outset of a business' adoption of trade dress, there is no basis in the statute to support the suggestion that such a requirement comes into being after some unspecified time.

## III

We agree with the Court of Appeals that proof of secondary meaning is not required to prevail on a claim under § 43(a) of the Lanham Act where the trade dress at issue is inherently distinctive, and accordingly the judgment of that court is affirmed.

*It is so ordered.*

JUSTICE SCALIA, concurring.

I write separately to note my complete agreement with JUSTICE THOMAS's explanation as to how the language of § 43(a) and its common-law derivation are broad enough to embrace inherently distinctive trade dress. Nevertheless, because I find that analysis to be complementary to (and not inconsistent with) the Court's opinion, I concur in the latter.

JUSTICE STEVENS, concurring in the judgment.

As the Court notes in its opinion, the text of § 43(a) of the Lanham Act, 15 U. S. C. § 1125(a) (1982 ed.), "does not mention trademarks or trade dress." *Ante,* at 774. Nevertheless, the Court interprets this section as having created a federal cause of action for infringement of an unregistered trademark or trade dress and concludes that such a mark or dress should receive essentially the same protection as those that are registered. Although I agree with the Court's conclusion, I think it is important to recognize that the meaning of the text has been transformed by the federal courts over the past few decades. I agree with this transformation, even though it marks a departure from the original text, because it is consistent with the purposes of the statute and has recently been endorsed by Congress.

## I

It is appropriate to begin with the relevant text of § 43(a).[1] See, *e. g., Moskal* v. *United States,* 498 U. S. 103 (1990); *K mart Corp.* v. *Cartier, Inc.,* 486 U. S. 281, 291 (1988); *United States* v. *Turkette,* 452 U. S. 576, 580 (1981). Section 43(a)[2] provides a federal remedy for using either "a false designation of origin" or a "false description or representation" in connection with any goods or services. The full text of the section makes it clear that the word "origin" refers to the geographic location in which the goods originated, and in fact, the phrase "false designation of origin" was understood to be limited to false advertising of geographic origin. For example, the "false designation of origin" language con-

---

[1] The text that we consider today is § 43(a) of the Lanham Act prior to the 1988 amendments; it provides:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." 15 U. S. C. § 1125(a) (1982 ed.).

[2] Section 43(a) replaced and extended the coverage of § 3 of the Trademark Act of 1920, 41 Stat. 534, as amended. Section 3 was destined for oblivion largely because it referred only to false designation of origin, was limited to articles of merchandise, thus excluding services, and required a showing that the use of the false designation of origin occurred "willfully and with intent to deceive." *Ibid.* As a result, "[a]lmost no reported decision can be found in which relief was granted to either a United States or foreign party based on this newly created remedy." Derenberg, Federal Unfair Competition Law at the End of the First Decade of the Lanham Act: Prologue or Epilogue?, 32 N. Y. U. L. Rev. 1029, 1034 (1957).

tained in the statute makes it unlawful to represent that California oranges came from Florida, or vice versa.[3]

For a number of years after the 1946 enactment of the Lanham Act, a "false description or representation," like "a false designation of origin," was construed narrowly. The phrase encompassed two kinds of wrongs: false advertising[4] and the common-law tort of "passing off."[5] False advertising meant representing that goods or services possessed characteristics that they did not actually have and passing off meant representing one's goods as those of another. Neither "secondary meaning" nor "inherent distinctiveness" had anything to do with false advertising, but proof of secondary meaning was an element of the common-law

---

[3] This is clear from the fact that the cause of action created by this section is available only to a person doing business in the locality falsely indicated as that of origin. See n. 1, *supra*.

[4] The deleterious effects of false advertising were described by one commentator as follows: "[A] campaign of false advertising may completely discredit the product of an industry, destroy the confidence of consumers and impair a communal or trade good will. Less tangible but nevertheless real is the injury suffered by the honest dealer who finds it necessary to meet the price competition of inferior goods, glamorously misdescribed by the unscrupulous merchant. The competition of a liar is always dangerous even though the exact injury may not be susceptible of precise proof." Handler, Unfair Competition, 21 Iowa L. Rev. 175, 193 (1936).

[5] The common-law tort of passing off has been described as follows:

"Beginning in about 1803, English and American common law slowly developed an offshoot of the tort of fraud and deceit and called it 'passing off' or 'palming off.' Simply stated, passing off as a tort consists of one passing off his goods as the goods of another. In 1842 Lord Langdale wrote:

"'I think that the principle on which both the courts of law and equity proceed is very well understood. A man is not to sell his own goods under the pretence that they are the goods of another man. . . .'

"In 19th century cases, trademark infringement embodied much of the elements of fraud and deceit from which trademark protection developed. That is, the element of fraudulent intent was emphasized over the objective facts of consumer confusion." 1 J. McCarthy, Trademarks and Unfair Competition § 5.2, p. 133 (2d ed. 1984) (McCarthy) (footnotes omitted).

passing-off cause of action. See, *e. g., G. & C. Merriam Co.* v. *Saalfield,* 198 F. 369, 372 (CA6 1912) ("The ultimate offense always is that defendant has passed off his goods as and for those of the complainant").

## II

Over time, the Circuits have expanded the categories of "false designation of origin" and "false description or representation." One treatise[6] identified the Court of Appeals for the Sixth Circuit as the first to broaden the meaning of "origin" to include "origin of source or manufacture" in addition to geographic origin.[7] Another early case, described as unique among the Circuit cases because it was so "forward-looking,"[8] interpreted the "false description or representation" language to mean more than mere "palming off." *L'Aiglon Apparel, Inc.* v. *Lana Lobell, Inc.,* 214 F. 2d 649 (CA3 1954). The court explained: "We find nothing in the legislative history of the Lanham Act to justify the view that [§ 43(a)] is merely declarative of existing law. . . . It seems to us that Congress has defined a statutory civil wrong of false representation of goods in commerce and has given a broad class of suitors injured or likely to be injured by such wrong the right to relief in the federal courts." *Id.,* at 651. Judge Clark, writing a concurrence in 1956, presciently observed: "Indeed, there is indication here and elsewhere that the bar has not yet realized the potential impact of this statutory provision [§ 43(a)]." *Maternally Yours, Inc.* v. *Your Maternity Shop, Inc.,* 234 F. 2d 538, 546 (CA2). Although some have criticized the expansion as unwise,[9] it is now "a firmly

[6] 2 *id.,* § 27:3, p. 345.

[7] *Federal-Mogul-Bower Bearings, Inc.* v. *Azoff,* 313 F. 2d 405, 408 (CA6 1963).

[8] Derenberg, 32 N. Y. U. L. Rev., at 1047, 1049.

[9] See, *e. g.,* Germain, Unfair Trade Practices Under § 43(a) of the Lanham Act: You've Come a Long Way Baby—Too Far, Maybe?, 64 Trademark Rep. 193, 194 (1974) ("It is submitted that the cases have applied Section

embedded reality."[10]   The United States Trade Association
Trademark Review Commission noted this transformation
with approval: "Section 43(a) is an enigma, but a very popu-
lar one.   Narrowly drawn and intended to reach false desig-
nations or representations as to the geographical origin of
products, the section has been widely interpreted to create,
in essence, a federal law of unfair competition. . . . It has
definitely eliminated a gap in unfair competition law, and its
vitality is showing no signs of age."[11]

Today, it is less significant whether the infringement falls
under "false designation of origin" or "false description or
representation"[12] because in either case § 43(a) may be in-
voked.   The federal courts are in agreement that § 43(a) cre-
ates a federal cause of action for trademark and trade dress
infringement claims.   1 J. Gilson, Trademark Protection and
Practice § 2.13, p. 2–178 (1991).   They are also in agreement
that the test for liability is likelihood of confusion: "[U]nder
the Lanham Act [§ 43(a)], the ultimate test is whether the
public is likely to be deceived or confused by the similarity
of the marks. . . . Whether we call the violation infringe-
ment, unfair competition or false designation of origin, the
test is identical—is there a 'likelihood of confusion?'"   *New
West Corp.* v. *NYM Co. of California, Inc.,* 595 F. 2d 1194,
1201 (CA9 1979) (footnote omitted).   And the Circuits are in

---

43(a) to situations it was not intended to cover and have used it in ways
that it was not designed to function").

[10] 2 McCarthy § 27:3, p. 345.

[11] The United States Trademark Association Trademark Review Com-
mission Report and Recommendations to USTA President and Board of
Directors, 77 Trademark Rep. 375, 426 (1987).

[12] Indeed, in count one of the complaint, respondent alleged that peti-
tioner "is continuing to affix, apply, or use in connection with its restau-
rants, goods and services a false designation o[f] origin, or a false descrip-
tion and representation, tending to falsely describe or represent the
same," and that petitioner "has falsely designated the origin of its restau-
rants, goods and services and has falsely described and represented the
same . . . ."   App. 44–45; see Tr. of Oral Arg. 37.

general agreement,[13] with perhaps the exception of the Second Circuit,[14] that secondary meaning need not be established once there is a finding of inherent distinctiveness in order to establish a trade dress violation under § 43(a).

### III

Even though the lower courts' expansion of the categories contained in § 43(a) is unsupported by the text of the Act, I am persuaded that it is consistent with the general purposes of the Act. For example, Congressman Lanham, the bill's sponsor, stated: "The purpose of [the Act] is to protect le-

[13] See, e. g., AmBrit, Inc. v. Kraft, Inc., 805 F. 2d 974 (CA11 1986), cert. denied, 481 U. S. 1041 (1987); Blau Plumbing, Inc. v. S. O. S. Fix-It, Inc., 781 F. 2d 604 (CA7 1986); In re Morton-Norwich Products, Inc., 671 F. 2d 1332, 1343 (C. C. P. A. 1982); Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F. 2d 695 (CA5 1981), cert. denied, 457 U. S. 1126 (1982); see also Fuddruckers, Inc. v. Doc's B. R. Others, Inc., 826 F. 2d 837, 843–844 (CA9 1987); M. Kramer Mfg. Co. v. Andrews, 783 F. 2d 421, 449, n. 26 (CA4 1986).

[14] Consistent with the common-law background of § 43(a), the Second Circuit has said that proof of secondary meaning is required to establish a claim that the defendant has traded on the plaintiff's good will by falsely representing that his goods are those of the plaintiff. See, e. g., Crescent Tool Co. v. Kilborn & Bishop Co., 247 F. 299 (1917). To my knowledge, however, the Second Circuit has not explained why "inherent distinctiveness" is not an appropriate substitute for proof of secondary meaning in a trade dress case. Most of the cases in which the Second Circuit has said that secondary meaning is required did not involve findings of inherent distinctiveness. For example, in Vibrant Sales, Inc. v. New Body Boutique, Inc., 652 F. 2d 299 (1981), cert. denied, 455 U. S. 909 (1982), the product at issue—a velcro belt—was functional and lacked "any distinctive, unique or non-functional mark or feature." 652 F. 2d, at 305. Similarly, in Stormy Clime Ltd. v. ProGroup, Inc., 809 F. 2d 971, 977 (1987), the court described functionality as a continuum, and placed the contested rainjacket closer to the functional end than to the distinctive end. Although the court described the lightweight bag in LeSportsac, Inc. v. K mart Corp., 754 F. 2d 71 (1985), as having a distinctive appearance and concluded that the District Court's finding of nonfunctionality was not clearly erroneous, id., at 74, it did not explain why secondary meaning was also required in such a case.

gitimate business and the consumers of the country."[15]  92 Cong. Rec. 7524 (1946).  One way of accomplishing these dual goals was by creating uniform legal rights and remedies that were appropriate for a national economy.  Although the protection of trademarks had once been "entirely a State matter," the result of such a piecemeal approach was that there were almost "as many different varieties of common law as there are States" so that a person's right to a trademark "in one State may differ widely from the rights which [that person] enjoys in another."  H. R. Rep. No. 944, 76th Cong., 1st Sess., 4 (1939).  The House Committee on Trademarks and Patents, recognizing that "trade is no longer local, but . . . national," saw the need for "national legislation along national lines [to] secur[e] to the owners of trademarks in interstate commerce definite rights."  *Ibid.*[16]

---

[15] The Senate Report elaborated on these two goals:

"The purpose underlying any trade-mark statute is twofold.  One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get.  Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.  This is the well-established rule of law protecting both the public and the trade-mark owner."  S. Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946).

By protecting trademarks, Congress hoped "to protect the public from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.  This is the end to which this bill is directed."  *Id.*, at 4.

[16] Forty years later, the USTA Trademark Review Commission assessed the state of trademark law.  The conclusion that it reached serves as a testimonial to the success of the Act in achieving its goal of uniformity: "The federal courts now decide, under federal law, all but a few trademark disputes.  State trademark law and state courts are less influential than ever.  Today the Lanham Act is the paramount source of trademark law in the United States, as interpreted almost exclusively by the federal courts."  Trademark Review Commission, 77 Trademark Rep., at 377.

Congress has revisited this statute from time to time, and has accepted the "judicial legislation" that has created this federal cause of action. Recently, for example, in the Trademark Law Revision Act of 1988, 102 Stat. 3935, Congress codified the judicial interpretation of § 43(a), giving its *imprimatur* to a growing body of case law from the Circuits that had expanded the section beyond its original language.

Although Congress has not specifically addressed the question whether secondary meaning is required under § 43(a), the steps it has taken in this subsequent legislation suggest that secondary meaning is not required if inherent distinctiveness has been established.[17] First, Congress broadened the language of § 43(a) to make explicit that the provision prohibits "any word, term, name, symbol, or device, or any combination thereof" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U. S. C. § 1125(a). That language makes clear that a confusingly similar trade dress is actionable under § 43(a), without necessary reference to "falsity." Second, Congress approved and confirmed the extensive judicial development under the provision, including its application to trade dress that the federal courts had come to apply.[18] Third, the legis-

---

[17] "When several acts of Congress are passed touching the same subject-matter, subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject." *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 309 (1911); see *NLRB* v. *Bell Aerospace Co. of Textron, Inc.*, 416 U. S. 267, 275 (1974); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380–381 (1969); *United States* v. *Stafoff*, 260 U. S. 477, 480 (1923) (opinion of Holmes, J.).

[18] As the Senate Report explained, revision of § 43(a) is designed "to codify the interpretation it has been given by the courts. Because Section 43(a) of the Act fills an important gap in federal unfair compe-

lative history of the 1988 amendments reaffirms Congress' goals of protecting both businesses and consumers with the Lanham Act.[19]   And fourth, Congress explicitly extended to any violation of § 43(a) the basic Lanham Act remedial provisions whose text previously covered only registered trademarks.[20]   The aim of the amendments was to apply the same protections to unregistered marks as were already afforded to registered marks.   See S. Rep. No. 100–515, p. 40 (1988). These steps buttress the conclusion that § 43(a) is properly understood to provide protection in accordance with the standards for registration in § 2.   These aspects of the 1988 legislation bolster the claim that an inherently distinctive trade dress may be protected under § 43(a) without proof of secondary meaning.

## IV

In light of the consensus among the Courts of Appeals that have actually addressed the question, and the steps on the part of Congress to codify that consensus, *stare decisis* concerns persuade me to join the Court's conclusion that secondary meaning is not required to establish a trade dress violation under § 43(a) once inherent distinctiveness

---

tition law, the committee expects the courts to continue to interpret the section.

"As written, Section 43(a) appears to deal only with false descriptions or representations and false designations of geographic origin.   Since its enactment in 1946, however, it has been widely interpreted as creating, in essence, a federal law of unfair competition.   For example, it has been applied to cases involving the infringement of unregistered marks, violations of trade dress and certain nonfunctional configurations of goods and actionable false advertising claims." S. Rep. No. 100–515, p. 40 (1988).

[19] "Trademark protection is important to both consumers and producers. Trademark law protects the public by making consumers confident that they can identify brands they prefer and can purchase those brands without being confused or misled.   Trademark laws also protec[t] trademark owners.   When the owner of a trademark has spent conside[r]able time and money bringing a product to the marketplace, trademark law protects the producer from pirates and counterfeiters." *Id.*, at 4.

[20] See 15 U. S. C. §§ 1114, 1116–1118.

has been established. Accordingly, I concur in the judgment, but not in the opinion, of the Court.

JUSTICE THOMAS, concurring in the judgment.

Both the Court and JUSTICE STEVENS decide today that the principles that qualify a mark for registration under § 2 of the Lanham Act apply as well to determining whether an unregistered mark is entitled to protection under § 43(a). The Court terms that view "common ground," though it fails to explain why that might be so, and JUSTICE STEVENS decides that the view among the Courts of Appeals is textually insupportable, but worthy nonetheless of adherence. See *ante*, at 768 (opinion of the Court); *ante*, at 781–782 (STEVENS, J., concurring in judgment). I see no need in answering the question presented either to move back and forth among the different sections of the Lanham Act or to adopt what may or may not be a misconstruction of the statute for reasons akin to *stare decisis*. I would rely, instead, on the language of § 43(a).

Section 43(a) made actionable (before being amended) "any false description or representation, including words or other symbols tending falsely to describe or represent," when "use[d] in connection with any goods or services." 15 U. S. C. § 1125(a) (1982 ed.). This language codified, among other things, the related common-law torts of technical trademark infringement and passing off, see *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 861, n. 2 (1982) (WHITE, J., concurring in result); *Chevron Chemical Co.* v. *Voluntary Purchasing Groups, Inc.*, 659 F. 2d 695, 701 (CA5 1981), cert. denied, 457 U. S. 1126 (1982), which were causes of action for false descriptions or representations concerning a good's or service's source of production, see, *e. g.*, *Yale Electric Corp.* v. *Robertson*, 26 F. 2d 972, 973 (CA2 1928); *American Washboard Co.* v. *Saginaw Mfg. Co.*, 103 F. 281, 284–286 (CA6 1900).

At common law, words or symbols that were arbitrary, fanciful, or suggestive (called "inherently distinctive" words or symbols, or "trademarks") were presumed to represent the source of a product, and the first user of a trademark could sue to protect it without having to show that the word or symbol represented the product's source in fact. See, *e. g.*, *Heublein* v. *Adams*, 125 F. 782, 784 (CC Mass. 1903). That presumption did not attach to personal or geographic names or to words or symbols that only described a product (called "trade names"), and the user of a personal or geographic name or of a descriptive word or symbol could obtain relief only if he first showed that his trade name did in fact represent not just the product, but a producer (that the good or service had developed "secondary meaning"). See, *e. g.*, *Florence Mfg. Co.* v. *J. C. Dowd & Co.*, 178 F. 73, 74–75 (CA2 1910). Trade dress, which consists not of words or symbols, but of a product's packaging (or "image," more broadly), seems at common law to have been thought incapable ever of being inherently distinctive, perhaps on the theory that the number of ways to package a product is finite. Thus, a user of trade dress would always have had to show secondary meaning in order to obtain protection. See, *e. g.*, *Crescent Tool Co.* v. *Kilborn & Bishop Co.*, 247 F. 299, 300–301 (CA2 1917); *Flagg Mfg. Co.* v. *Holway*, 178 Mass. 83, 91, 59 N. E. 667 (1901); *Philadelphia Novelty Mfg. Co.* v. *Rouss*, 40 F. 585, 587 (CC SDNY 1889); see also J. Hopkins, Law of Trademarks, Tradenames and Unfair Competition § 54, pp. 140–141 (3d ed. 1917); W. Browne, Law of Trade-Marks §§ 89*b*, 89*c*, pp. 106–110 (2d ed. 1885); Restatement (Third) of the Law of Unfair Competition § 16, Comment *b* (Tent. Draft No. 2, Mar. 23, 1990) (hereinafter Third Restatement).

Over time, judges have come to conclude that packages or images may be as arbitrary, fanciful, or suggestive as words or symbols, their numbers limited only by the human imagination. See, *e. g.*, *AmBrit, Inc.* v. *Kraft, Inc.*, 812 F. 2d 1531, 1536 (CA11 1986) ("square size, bright coloring, pebbled tex-

ture, polar bear and sunburst images" of the package of the "Klondike" ice cream bar held inherently distinctive), cert. denied, 481 U. S. 1041 (1987); see also Third Restatement §§ 13, 16. A particular trade dress, then, is now considered as fully capable as a particular trademark of serving as a "representation or designation" of source under § 43(a). As a result, the first user of an arbitrary package, like the first user of an arbitrary word, should be entitled to the presumption that his package represents him without having to show that it does so in fact. This rule follows, in my view, from the language of § 43(a), and this rule applies under that section without regard to the rules that apply under the sections of the Lanham Act that deal with registration.

Because the Court reaches the same conclusion for different reasons, I join its judgment.