**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 99-40753

(Summary Calendar)

_____

LADY PRIMROSE'S, INC.,

Plaintiff-Appellee,

versus

AFTER HOURS BATH PRODUCTS, INC.,

Defendant-Appellant.

Appeal from the United States District Court
For the Eastern District of Texas
No. 4:98-CV-00356

March 6, 2000

Before DAVIS, EMILIO M. GARZA, and DENNIS, Circuit Judges.

PER CURIAM:[*]

After Hours Bath Products, Inc. ("After Hours") appeals the granting of a preliminary injunction to Lady Primrose's, Inc. ("Lady Primrose's") on account of After Hours's alleged trade dress infringement of a variety of Lady Primrose's luxury bath and skin care products. We affirm.

**I.**

Lady Primrose's manufactures and distributes luxury bath and skin care products. These products are very expensive relative to the cost of their raw materials, and sales are largely dependent on the products' elegant and sophisticated packaging. Accordingly, Lady Primrose's spent substantial

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

sums developing the packaging for many of its products, which include "Dusting Silk," a "Cappucino Cream Brulee Candle," a "Nectar Soap," a "Tryst Candle," a "Caledon Pedestal Candle," and a "Biscuit Barrel." After Hours, a recent entrant into the luxury bath product market, developed many similar products, including "French Lace Dusting Powder," a "Café au Lait Candle," a "French Lace Soap on Porcelain," a "Vanilla Royale Pillar Candle," a "French Lace Pillar Candle," and "Small Jar Bath Crystals."

Lady Primrose brought suit in Texas state court, claiming that After Hours copied many of its products, and asserting state law causes of action for trade dress infringement, misappropriation, and unfair competition. Lady Primrose asked for temporary and permanent injunctions to stop After Hours from selling its virtually identical products alone or in combination. After Hours removed the case, claiming that Lady Primrose's allegations also stated a claim under the Lanham Act, 15 U.S.C. § 1125. After hearing argument and viewing the products in question, a magistrate recommended that a preliminary injunction be granted. The district court agreed and entered a preliminary injunction.

**II.**

"A preliminary injunction is an extraordinary equitable remedy that may be granted only if the plaintiff establishes four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest." *Sunbeam Products, Inc. v. The West Bend Co.*, 123 F.3d 246, 250 (5th Cir. 1997). On appeal, "a preliminary injunction order must not be disturbed unless grounded upon a clearly erroneous factual determination, an error of law, or an abuse of discretion." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

On appeal, After Hours challenges only the district court's finding that Lady Primrose's had "a substantial likelihood of success on the merits." This finding was premised on a determination that After Hours infringed on the trade dress of Lady Primrose's. The trade dress inquiry encompasses three subsidiary questions: (1) Lady Primrose's products are "inherently distinctive" or have acquired

"secondary meaning," (2) whether the products are "functional," and (3) whether there is a "likelihood of confusion" between Lady Primrose's products and After Hours's products. *See Sunbeam*, 123 F.3d at 251. These elements are all questions of fact. *See Pebble Beach Co. v. Tour 18 Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998). Accordingly, we review each of these questions for clear error, and "we will reverse the district court only if we have a definite and firm conviction that a mistake has been committed." *Id*.

## III.

"Trade dress" refers "to the total image and overall appearance of a product." *Sunbeam*, 123 F.3d at 251. The inquiry into what a particular product's trade dress encompasses "does not focus on isolated elements of the dress, but on whether a combination of features creates a distinctive visual impression, identifying the source of the product." *Id.* at 251 n.1; *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n.1, 112 S. Ct. 2753, 2755 n.1, 120 L. Ed. 2d 615, __ (1992) (**"**The 'trade dress' of a product is essentially its total image and overall appearance . . . [and] may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques."); *Pebble Beach*, 155 F. 3d at 536. Essentially, when analyzing a "trade dress" issue, the component parts of any particular product are largely irrelevant; the inquiry is whether the product's distinct combination of colors and features is sufficiently distinct to connote a particular producer and sufficiently arbitrary that a monopoly over that particular combination of colors and features would not stifle competition.

A.

To qualify for trade dress protection, Lady Primrose's products first must either be "inherently distinctive," in that their "intrinsic nature serves to identify a particular source of a product," *see Two Pesos*, 505 U.S. at 768, 112 S. Ct. at 2757, 120 L. Ed. 2d at __; *Sunbeam*, 123 F. 3d at 251, or must have acquired "secondary meaning," in that through exposure in the market the products "have come

to be uniquely associated with a particular source."[1] *Id.* The district court held that Lady Primrose's products were "inherently distinctive" and that they had acquired "secondary meaning."

Products are "inherently distinctive" if they are suggestive, arbitrary, or fanciful as opposed to merely generic or descriptive. *See Two Pesos*, 505 U.S. at 768, 112 S. Ct. at 2757, 120 L. Ed. 2d at __. As the magistrate found, Lady Primrose's products are "inherently distinctive" because the particular arbitrary combination of colors, raw materials (i.e. the glass or porcelain containers, the soap, powder, wax, etc.), and creative packaging (including, for example, silver spoons and tassels) "serve[] to identify a particular source," i.e. Lady Primrose's.[2] After Hours argues that Lady Primrose's products are not "inherently distinctive" because Lady Primrose's did not originate the "elegant upscale look" generated by the combination of features, which After Hours asserts is common to a plethora of manufacturers. This, however, is not the focus of the "inherently distinctive" inquiry. While other competitors in the market use many of the same materials,[3] they have found many different

---

[1] "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Two Pesos*, 505 U.S. at 766 n.4, 112 S. Ct. at 2756, 120 L. Ed. 2d at __ (citing *Inwood Laboratories, Inc. v. Ives Laboratories*, 456 U.S. 844, 851 n.11, 102 S. Ct. 2182, 2187 n.11, 72 L. Ed. 2d 606 (1982).

[2] After Hours characterizes Lady Primrose's claim to "inherent distinctiveness" to be based on its "product configuration." We have previously declined to resolve whether a product configuration can be, in and of itself, "inherently distinctive," *see Sunbeam*, 123 F.3d at 252 (noting that this is a "controversial question"), and we need not answer this query in this case. Lady Primrose's claim to "inherent distinctiveness" is not based on "product configuration" but rather on its extensive product packaging design. As we stated in *Sunbeam*:

> Product packaging designs, like trademarks, often share membership in a practically inexhaustible set of distinct but approximately equivalent variations, and an exclusive right to a particular overall presentation generally does not substantially hinder competition in the packaged good, the item in which a consumer has a basic interest. A product configuration, contrariwise, commonly has finite competitive variations that, on the whole, are equally acceptable to consumers.

*Id.* at 253 n.9. Since product packaging designs containing the same materials used by Lady Primrose's are infinite, the particular combinations chosen by Lady Primrose's are capable of trade dress protection.

[3] After Hours, relying primarily on *Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063 (2d Cir. 1995), argues that because some of the raw materials used by Lady Primrose's are common to many manufacturers, they cannot claim trade dress protection over their products.

combinations and assortments of those features to make their individual products unique. After Hours's products, however, combined those features in a manner so identical to Lady Primrose's that it cannot be the product of mere coincidence.[4] Accordingly, the district court did not clearly err in determining that Lady Primrose's products were "inherently distinctive."

After Hours also claims that the district court clearly erred in finding that Lady Primrose's products had acquired "secondary meaning." "The gravamen of the secondary meaning determination is the empirical question of current consumer association." *Sunbeam*, 123 F.3d at 253 (citing *Two Pesos*, 505 U.S. at 770, 112 S. Ct. at 2758, 120 L. Ed. 2d at __). In evaluating this empirical question, courts may consider "the length and manner of use of a mark, the nature and extent of advertising and promotion of the mark, the sales volume of the product, and instances of actual confusion." *Id.* at 254.

Lady Primrose's provided affidavit evidence showing that there was a "mental association in buyers' minds between the alleged mark a single source of the product." *Sunbeam*, 123 F.3d at 253 (citing *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 425 n.4 (5th Cir. 1984)). That evidence included affidavits from buyers stating that when they viewed the particular products over which Lady Primrose's claims trade dress, they knew that Lady Primrose's was the producer. While "survey" evidence would be the most "direct and persuasive of evidence of secondary meaning," affidavit

---

However, *Mana* is inapposite. In *Mana*, the Second Circuit held that a makeup compact, which included black, quadrangular packaging, interior mirrors, and tins, was not inherently distinctive because "the total impression of plaintiff's compacts cannot be described as suggestive, arbitrary, or fanciful." *Id.* at 1070. This was based, in part, on the observation that "the compacts' size and shape) ) with their rectangular and square designs) ) are common characteristics of the entire genere of makeup compacts." *Id.* The case at bar, however, is factually distinguishable. While *some* of the raw materials used by both Lady Primrose's and After Hours are common to other participants in the marketplace, the particular combination of materials chosen by Lady Primrose's is arbitrary, and suggestively serves to identify Lady Primrose's as the particular source of the product.

[4]     After Hours also argues that Lady Primrose's cannot claim trade dress protection because it does not "own" the particular choices of features it has made. However, "[t]he Lanham act does not require a party to 'own' a word, symbol, or other identifying mark before it may be granted protection from infringement. Rather, all that is required is that a party 'use' the mark in commerce to identify its services and distinguish them from the services of others." *Pebble Beach,* 155 F.3d at 542.

evidence can be sufficient.[5]  *Id.*  Accordingly, the district court's determination that Lady Primrose's products had acquired secondary meaning was not clearly erroneous.

B.

Even if a product is inherently distinctive or has acquired secondary meaning, it does not receive trade dress protection if it is "functional."  As here, "where the trade dress of a product consists of a particular configuration of features, the functionality of the design turns on whether its design as a whole is superior to other designs, not on whether its component features viewed individually each have a function." *Pebble Beach*, 155 F.3d at 537; *see also Two Pesos*, 505 U.S. at 775, 112 S. Ct. at 2760, 120 L. Ed. 2d at __ (holding that a product is "functional" if it is "one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection").  A product is "functional" if exclusive use "would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 165, 115 S. Ct. 1300, 1304, 131 L. Ed. 2d 248, __ (1995); *Pebble Beach*, 155 F.3d at 537.

As described above, there are literally thousands of potential permutations of colors, sizes, shapes, and distinct "elegant" features which a company could theoretically utilize within the general "high-end, elegant, feminine" bath product market; in fact, the current state of the market (as shown by After Hours's vast catalogue of evidence) proves this to be true.  There is no evidence in the record to indicate that the particular combinations chosen by Lady Primrose's are "superior or optimal in terms of engineering, economy of manufacture, accommodation of utilitarian function or performance." *Pebble Beach*, 155 F.3d at 537.[6]  As the magistrate judge found, "[n]one of the

---

[5]     After Hours has submitted affidavits averring that the "look" Lady Primrose's products presents is not unique and, indeed, that it has been done for years.  However, this misconstrues the focus of the "secondary meaning" inquiry in particular and trademark law in general.  The "look") ) upscale, elegant, decorative, ornate bath products) ) is not worthy of trade dress protection. The specific combination of colors, designs, and raw materials used by Lady Primrose's to create their unique version of the "look," however, is protectable.

[6]     After Hours argues that Lady Primrose's uses some raw materials (for example, a particular shaker) which are used by many manufacturers because they are the most economical.  The evidence

features and combinations of features that make After Hours products look like [Lady Primrose's] products make them easier or less expensive to manufacture. Moreover, there are other manufacturers and suppliers that compete against [Lady Primrose's] in the marketplace of luxury skin and bath products without using the same combination and features used by [Lady Primrose's]." Accordingly, the district court did not clearly err in determining that Lady Primrose's products are not functional.

C.

Because Lady Primrose's products either are inherently distinctive or have acquired secondary meaning, and they are not functional, they are worthy of trade dress protection. However, After Hours has only infringed on Lady Primrose's trade dress if there is a "likelihood of confusion" between the two companies' products. *See Sunbeam*, 123 F.3d at 257; *Pebble Beach*, 155 F.3d at 543. The factors weighed in this inquiry, known as the "digits of confusion," are: (1) the similarity of the two products; (2) the identity of the retail outlets and purchasers, (3) the identity of advertising media, (4) the strength of the trade dress, (5) the intent of the defendant, (6) similarity of design, (7) evidence of actual confusion, and (8) the degree of care employed by consumers. *See Sunbeam*, 123 F.3d at 257; *Pebble Beach*, 155 F.3d at 543.

Having reviewed the record on the first, fifth, and sixth "digits of confusion," we agree with the magistrate judge's observation that "[i]t appears to the Court that After Hours intentionally copied the products of [Lady Primrose's] and the appearance could not be due to mere coincidence." Indeed, each and every After Hours product is so strikingly similar to their counterpart in the Lady Primrose's line that we can only infer an intent to copy.

---

in the record, however, shows at least some options other than the identical combination chosen by Lady Primrose's are at least comparable in price. However, even if the particular raw materials used by Lady Primrose's are the most economical, that does not make the particular products sold by Lady Primrose's))including their color, shape, size, design, and specific accessories))functional. Essentially, After Hours's argument is that Lady Primrose's cannot obtain trade dress protection for its products if some of the features contained therein are functional. As we have previously held, "This is manifestly not the law. To the contrary, we previously have characterized this argument as a 'fallacious syllogism,' belied by the principle that an arbitrary combination of functional features may be non-functional." *Sunbeam*, 123 F.2d at 256 ("[A]n arbitrary combination of functional features may nevertheless be non-functional for purposes of trade dress protection.").

Further, as part of the eighth "digit of confusion," Lady Primrose's submitted evidence that its primary target consumers had actually confused the products of After Hours for Lady Primrose products. That evidence includes several affidavits from frequent purchasers of Lady Primrose's products who, while shopping in department stores or at gift shows, actually mistook After Hours's products for Lady Primrose's. For example, Daniel Benedict, the national sales director for a company which sells to both Saks Fifth Avenue and Neiman Marcus, recounted a circumstance where, while walking through Saks and viewing After Hours products, he commented to a friend that "I didn't know that Saks carried Lady Primrose's."

While "no single factor is dispositive of the likelihood of confusion," *Sunbeam*, 123 F.3d at 257, we find the this evidence presented by Lady Primrose's, in addition to the evidence submitted on the other digits, sufficiently persuasive. Accordingly, we cannot say that the district

court clearly erred in holding that there was a "likelihood of confusion" between the products of Lady Primrose's and those of After Hours.

**IV.**

After Hours also complains about the scope of the district court's injunction, asserting that it is both confusing and unduly restrictive. We review the scope and form of the injunction only for an abuse of discretion. *See Pebble Beach*, 155 F. 3d at 550. In reviewing the scope of the injunction, we note that "in fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Id.* (citing *Taco Cabana*, 932 F.2d at 1126).

After Hours's primary complaint, relevant to the form of the injunction, is that parts of the injunction are contradictory. Specifically, After Hours is enjoined from:

> Manufacturing, distributing, advertising, displaying, or offering for sale the After Hours French Lace Dusting Powder or any similar product in any cut glass or crystal container with a silver shaker top.

At the same time, the injunction provides that:

> [N]othing in this order shall be construed to prohibit the use by After Hours of any containers made of glass, crystal or porcelain, provided that the use of any such containers by After Hours does not infringe upon the trade dress of Lady Primrose's.

After Hours claims that these two provisions, in combination, make it unclear exactly what activities using glass, crystal or porcelain fall within the scope of the injunction.

After Hours' claim that under the words of this portion of the injunction, it would be unable to use "any glass and silver shaker, regardless of size, shape and appearance," is an inaccurate characterization of the injunction. This part of the injunction prohibits only the manufacture and distribution of After Hours' French Lace Dusting Powder or a similar product within a container which entails both a cut glass shaker *and* a silver shaker top. The combinations remaining available to After Hours include, but are not limited to, offering the Dusting Powder in the same shaker with a different

-9-

top,[7] using a different glass shaker with a different top, or producing a different product in the identical container. The injunction cannot be read in pieces, and each prohibition must be read in light of the proviso that "nothing in this order shall be construed to prohibit the use by After Hours of any containers made of glass, crystal or porcelain, provided that the use of any such containers by After Hours does not infringe upon the trade dress of Lady Primrose's." This proviso makes the injunction, while protective of Lady Primrose's, not unduly burdensome upon After Hours.

Overall, we find that the form of the injunction does not constitute an abuse of discretion. While under the injunction After Hours cannot manufacture and sell products that are completely identical to Lady Primrose's counterparts, After Hours can produce products which, though using some of the same materials, are a "safe distance" away from Lady Primrose's trade dress. Though the injunction does not explicitly state how it would apply to future After Hours products which do not yet exist, it represents a proper balancing of the equities and is flexible enough to protect Lady Primrose's against a broad range of possible infringement while still allowing After Hours to compete in the marketplace.[8]

After Hours also complains about the scope of the injunction, asserting that because the injunction prohibits it from using some specific materials (such as the ubiquitous glass shaker with a silver top, as well as spoons and tassels) that are used by many participants in the marketplace, it is unduly burdensome. We note that with respect to the accessories, the injunction prohibits only the

---

[7] We note that the record shows that the identi cal shaker with a gold top would cost After Hours exactly the same price, and the identical shaker with a chrome top would be less expensive.

[8] After Hours also claims that the district court's injunction violates FED. R. CIV. P. 65(d), which mandates that "[e]very order granting an injunction . . . shall be specific in terms . . . [and] shall describe in reasonable detail . . . the act or acts sought to be restrained." We disagree. "The purpose of the rule is to put the parties on fair notice of what they are forbidden to do. Thus, an injunction ordering a party to 'obey the law' might well fail as overbroad." *United States v. Corn*, 836 F.2d 889, 892 (5th Cir. 1988). This injunction, while not self-applying, specifically prohibits the production of specific products and others that infringe on Lady Primrose's trade dress; accordingly, it did far more than merely tell After Hours to "obey the law." Further, given that the injunction would have to apply to future After Hours products which do not yet exist as well as to their current products, "the degree of specificity here is appropriate in light of the commercial environment in which applies." *United States v. Central Adjustment Bureau, Inc.*, 823 F.2d 880, 881 (5th Cir. 1987). Accordingly, we find the injunction to be sufficiently specific to satisfy the requirements of FED. R. CIV. P. 65(d).

use of the specific tassels and only *silver* spoons which are identical to those used by Lady Primrose's. After Hours is permitted to use other, distinguishable forms of these same accessories under the terms of the injunction. Further, even if this prohibition is slightly overbroad, "the 'safe distance' rule permits the court to issue injunctions that sweep even more broadly than the Lanham Act would permit against a manufacturer who has not already been found liable for trademark infringement." *Sunbeam*, 123 F.3d at 260 ("[T]he district court possesses broad discretion to vindicate the preliminary injunction by prohibiting subsequent modifications that do not move a 'safe distance' away from the trademark infringement."). The fact that other participants in the marketplace will be permitted to use silver spoons and white tassels, while After Hours cannot, is inconsequential. *See id.* ("[A] competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance away from the margin line) ) even if that requirement involves a handicap as compared with those who have not disqualified themselves."). Accordingly, we cannot say that the scope of injunction imposed by the district court was an abuse of discretion.

## V.

Finally, After Hours complains about the procedures under which the district court acted, protesting its failure to hold a formal evidentiary hearing and its sole reliance on affidavit and pictorial evidence. However, After Hours, like Lady Primrose's, never requested an evidentiary hearing before the magistrate judge or the district court. It is well-settled that arguments not raised in the district court are waived. *See Atwater v. City of Lago Vista*, 195 F. 3d 242, 254 n.3 (5th Cir. 1999) (en banc). We will not fault the magistrate judge or the district court for failing to hold an evidentiary hearing when neither party asked for one on either occasion. *See Drywall Tapers and Pointers of Greater New York, Local 1974 of I.B.P.A.T., AFL-CIO v. Local 530 of Operative Plasterers and Cement Masons Int'l Ass'n*, 954 F.2d 69, 77 (2d Cir. 1992) ("When parties are content in the district court to rest on affidavits, the right to an evidentiary hearing is waived.").

## VI.

The district court, in granting a preliminary injunction, ruled that Lady Primrose's had a

-11-

"substantial likelihood of success on the merits."  Without casting any light on the ultimate outcome of the case, we hold that this determination was not an abuse of discretion.  Accordingly, we AFFIRM the judgment of the district court.