**QUOC VIET FOODS, INC., Plaintiff,**

**v.**

**VV FOODS, LLC, et al., Defendants.**

**Case No.: SACV 12-02165-CJC(DFMx)**

United States District Court,
C.D. California, Southern Division.

Signed June 14, 2016

William L. Buus, Lex Opus APC, Costa Mesa, CA, John D. Tran, Rosalind Thuy Ong, Rhema Law Group PC, Irvine, CA, for Plaintiff.

Charles C. H. Wu, Vikram M. Reddy, Thanh-Thuy T. Luong, ·Charles C.H. Wu and Associates APC, Roy L. Comer, Civil Justice Attorney, Irvine, CA, Mitchell C. Tilner, Peder Kristian Batalden, Horvitz and Levy LLP, Encino, CA, Robert A. Merring, Robert A. Merring Law Offices, Costa Mesa, CA, for Defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION AND BACKGROUND

This is a trademark case involving soup base for pho, a Vietnamese noodle soup. The traditional preparation of pho is highly labor-intensive: a pho cook will begin by boiling beef bones for 30 minutes, discarding the water, washing the bones, and then boiling them again to slowly extract the bone marrow and make a broth. (Dkt. 270-1 ["Reddy Decl."] Exh. 1 at 12–13.) Properly done, this process takes about a day. (Id. at 13.) Crucially, while the broth is cooking, the cook must scrape away detri-

tus and scum that floats to the top of the pot. (Id.) Failing to do so will leave the broth cloudy instead of clear, as desired. (Id.) A pho cook needs to tend the pot for many hours, periodically scraping the top and slowly extracting the marrow. (Id. at 14.) Eventually meat and noodles are added to the broth to create the finished soup.

To simplify this process for individual consumers who do not have the time necessary to prepare pho, Tuan Nguyen—the president and CEO of Plaintiff Quoc Viet, Inc.—devised a soup base, sold in paste form, to which consumers could add water and quickly create pho broth without the intense traditional preparation process. (Reddy Decl. Exh. 1 at 13.) In 2002, Quoc Viet began selling its first two soup base products—one beef-flavored and one chicken-flavored. The beef-flavored soup base was labeled COT PHO BÒ, and the chicken-flavored base was labeled COT PHO GÀ. (Id. at 14–15.) Tuan Nguyen explained that in Vietnamese, "pho bo" means "beef pho soup," and "pho ga" means "chicken pho soup." The parties dispute the meaning of "cot": Quoc Viet argues that "cot" means "bones of the dead" or "skeleton," and that its meaning has nothing to do with pho soup. Defendant VV Foods LLC argues that "cot" means "condensed," "concentrated," or "base," and that in the context of Quoc Viet's products, "cot" simply describes a pho soup base.

Only a few months after Quoc Viet began selling pho soup bases, VV Foods began producing and selling its own Vietnamese pho soup bases, also branded as COT PHO BÒ and COT PHO GÀ. Since 2002, the parties have—in parallel—developed a number of other flavors of soup bases, including pork and vegetarian varieties. Quoc Viet, believing that it owns trademark rights in the names of its soup bases, ultimately registered a number of trademarks with the United States Patent

and Trademark Office ("PTO"). Seven of those marks, which this order refers to as the " 'Cot' marks," are at issue here. Those marks, and the associated Quoc Viet products, are:

| MARK | PRODUCT |
| --- | --- |
| CỐT PHỞ BÒ | Beef-flavored pho soup base |
| CỐT PHỞ GÀ | Chicken-flavored pho soup base |
| CỐT BÚN BÒ HUẾ | Beef-flavored vermicelli soup base[1] |
| CỐT SÚP HEO | Pork-flavored soup base |
| CỐT SÚP CHAY | Vegetarian soup base |
| CỐT SÚP GÀ | Chicken-flavored soup base |
| CỐT LẨU THÁI LAN | Thai soup base |

In December 2012, Quoc Viet filed a complaint against VV Foods and two of its principals, Nga Vu and Thanh Vu, alleging that they are all infringing the seven marks at issue. (Dkt. 1; *see also* Dkt. 29.) The case proceeded to trial in March 8, 2016, (*see* Dkt. 215), and the jury began their deliberations on March 16, (Dkt. 253). On March 18, the jury returned a verdict, finding that each of the seven trademarks was valid, protectable, and owned by Quoc Viet, that VV Foods—but not Nga Vu or Thanh Vu—infringed the trademarks, and that VV Foods' use did not constitute fair use. (Dkt. 247.) The jury deadlocked on the question of what damages Quoc Viet suffered, although it did agree that the statute of limitations barred Quoc Viet from collecting *any* damages it incurred prior to December 14, 2008. (*Id.*)

Before the Court is VV Foods' motion for judgment as a matter of law. (Dkt. 270.) VV Foods contends that Quoc Viet's "Cot" marks are not valid and protectable. After considering all the evidence presented at trial, the Court agrees with VV Foods and GRANTS its motion for judg-

ment as a matter of law. Quoc Viet's "Cot" marks all lack the required distinctiveness to be valid and protectable because they are merely descriptive and did not acquire secondary meaning prior to VV Foods' initial use.

## II. ANALYSIS

### A. Motion for Judgment as a Matter of Law

 VV Foods moves for judgment as a matter of law on the ground that the marks at issue are not valid and protectable. Under Federal Rule of Civil Procedure 50(a) and (b), a court may enter judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [prevailing] party" as to an issue on which that party has been fully heard during trial. A party seeking judgment as a matter of law has a "very high" standard to meet. *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir.2002). The jury's verdict must be upheld if, viewing the facts in the light most favorable to the nonmoving party, there is sufficient evidence for a reasonable jury to have found in the nonmoving party's favor. *Johnson v. Paradise Valley Unified Sch.*

---

1. "Bun bo hue" is evidently a particular dish, similar to pho. (Reddy Decl. Exh. 6 at 41–42.)

*Dist.*, 251 F.3d 1222, 1227 (9th Cir.2001). Judgment as a matter of law is appropriate in trademark infringement cases if no reasonable jury could find that the trademarks at issue are valid and protectable. *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1048 (9th Cir.1998).

## B. Trademark Law

A trademark is a "word, name, symbol or device" that is used by a manufacturer or seller of goods or services to "identify and distinguish the seller's goods from goods made or sold by others." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3:1 (4th ed. 2015).[2] Laws protecting trademarks have three primary goals: (1) protecting the public from being misled or confused about the nature and source of goods; (2) protecting the rights of a business to identify itself to the public and to protect its reputation in offering goods to the public; and (3) achieving the first two goals in a manner consistent with free and fair competition. *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 618 (9th Cir.1993). To balance these sometimes-conflicting goals, trademark law protects only "distinctive" marks, or marks that are "used by a substantial number of people as a symbol to identify and distinguish one source." 2 McCarthy § 11:2. Indeed, as Professor McCarthy explains, a word or symbol that is not distinctive is not a trademark at all. *Id.* ("No distinctiveness—no mark.").

▆▆ Trademarks are "often classified in categories of generally increasing distinctiveness; . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Fanciful,

arbitrary, and suggestive marks "are deemed inherently distinctive and are entitled to protection." *Id.* This is because they "naturally serve to identify a particular source of a product." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir.2005). Generic marks, by contrast, "are not capable of receiving protection because they identify the product, rather than the product's source." *Id.* Descriptive marks fall in between: they are "not inherently distinctive," but may "acquire the distinctiveness which will allow them to be protected." *Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753. This acquired distinctiveness is better known as "secondary meaning." *Id.*

Fanciful, arbitrary, and generic marks are usually easy to identify. Fanciful marks are " 'coined words' that have been invented or selected for the sole purpose of functioning as a trademark," like "CLOROX," for bleach. 2 McCarthy § 11:5, 8. Arbitrary marks are words that are "in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality, or characteristic of those goods or services," like "OMEGA," for watches. *Id.* § 11:11, 13. Generic marks simply restate the identity of the product, like "CREAMED CORN" for, well, creamed corn. These three categories are usually easy enough to differentiate.

But, "[a]s with tonal shade variations in the colors of the visible spectrum of sunlight, the categories of the trademark spectrum often become difficult to distinguish at the boundaries." *Id.* § 11:2; *see also Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1197 (9th Cir.2009) ("[L]egions of trademark lawyers can stay busy arguing about how marks in the middle, not so

---

**2.** Professor McCarthy's treatise is hereinafter cited simply as "McCarthy," with the appro- priate volume and section numbers.

plainly descriptive, nor so plainly distinctive, should be categorized."). Particularly difficult is the boundary between descriptive and suggestive marks. As the Fourth Circuit has observed, "the line between descriptive and suggestive marks is scarcely 'pikestaff plain,' and the distinction to be given the two terms is frequently made on an intuitive basis rather than as a result of logical analysis susceptible of articulation." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1528 (4th Cir.1984). The Ninth Circuit has similarly lamented that determining whether a mark is suggestive or descriptive is "far from an exact science" and "a tricky business at best." *Lahoti*, 586 F.3d at 1197; *see also* 2 McCarthy § 11:66 ("The descriptive category almost imperceptibly shades over at its fringe into the suggestive domain."). And properly determining whether a mark is suggestive or descriptive is particularly important because when a mark owner cannot show secondary meaning, protectability turns entirely on the owner's ability to establish that the mark is inherently distinctive.

"Various tests for determining the difference" between suggestive and descriptive marks have been used by courts. 2 McCarthy § 11:66. The Ninth Circuit primarily applies what Professor McCarthy calls the "degree of imagination" test, which asks "how much imagination is required to get a description of the goods or services." *Id.* § 11:67. Under this test, the *Lahoti* court explained,

the primary criterion for distinguishing between a suggestive and a descriptive mark is the imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process from the mark to the particular product. A mark is suggestive if "imagination" or a "mental leap" is required in order to reach a conclusion as to the nature of the product being referenced. By contrast, a mark is descriptive if it defines a particular characteristic of the product

in a way that does not require any exercise of the imagination.

586 F.3d at 1198 (citations and some internal quotation marks removed). Professor McCarthy concludes that "[if] the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness," and gives a number of examples of marks requiring, in his opinion, "some degree of imagination": "GLOW," for skin cream, "PENGUIN," for food freezers, and "SAMSON," for weight training machines. 2 McCarthy § 11:67. By contrast, if a term "immediately conveys to one seeing or hearing it knowledge of the ingredients, qualities, or characteristics of the goods or services with which it is used," it is descriptive. *Id.* § 11:19 (quoting *Application of Quik–Print Copy Shops, Inc.*, 616 F.2d 523, 525 (C.C.P.A.1980)). As Professor McCarthy points out, courts have determined that "BREAK AND BAKE," for frozen cookie dough, "CAR-FRESHNER," for an automobile air deodorizer, and "TENDER VITTLES," for cat food, are descriptive. *Id.* § 11:24 (internal citations omitted).

Applying the degree of imagination test, courts in the Ninth Circuit have recently determined that:

- The mark "POM," for pomegranate juice, is suggestive, since "the word 'POM'—which is not ascribed independent pomegranate-related meaning by conventional dictionaries—requires customers to use some additional imagination and perception to decipher." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1126 (9th Cir.2014).

- The mark "LIFEPROOF," used for a protective cell phone case, is descriptive, since "no mental leap" was required "for a purchaser of the product to conclude it will protect the electron-

ic device from the exposures of life, such as water, dust, and scratches." *Seal Shield, LLC v. Otter Prods., LLC*, CASE NO. 13–cv–2736–CAB, 2014 WL 11350295, at *9 (S.D.Cal. Nov. 4, 2014).

- The mark "ECODIESEL," for diesel fuel, is descriptive, since a mental leap is not necessary to conclude that the mark refers to "a diesel fuel product that is more ecological than normal diesel fuel." *Unitek Solvent Servs. v. Chrysler Group LLC*, No. 12–00704, 2013 WL 5503087, at *7 (D.Hawaii Sept. 30, 2013).

■ Descriptive marks are only protectable upon a showing of secondary meaning. *Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753. Secondary meaning is present when, "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). Importantly, secondary meaning is not called "secondary" because it is "second in importance" to some other factor, but because "[i]t is a new meaning added *second in time* to the original primary meaning of a designation," which "adds a new layer of meaning" to the original, descriptive meaning. 2 McCarthy § 15:1 (emphasis added). Secondary meaning takes time to develop, and it is "safe to say that no secondary meaning emerges full-blown at conception." *beef & brew, inc. v. Beef & Brew, Inc.*, 389 F.Supp. 179, 185 (D.Or.1974) (citation omitted). And, crucially, "a senior user must prove the existence of secondary meaning in its designation at the time and place that the junior user began its use of that designation." 2 McCarthy § 15:53; *see also Carter-Wallace, Inc. v. Procter &*

*Gamble Co.*, 434 F.2d 794, 799 (9th Cir. 1970) (descriptive marks were not protectable "since there was no proof of secondary meaning prior to the ... use ... of defendant"). "If the senior user cannot prove that its mark possessed secondary meaning at the time defendant commenced its use, there can be no infringement." 2 McCarthy § 16:34.

■ "[P]roof of secondary meaning entails vigorous evidentiary requirements." *Coach Leatherware Co., Inc. v. Ann Taylor, Inc.*, 933 F.2d 162, 169 (2d Cir.1991). It can be established in "many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity; manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir.1999). The inquiry into whether a particular mark has acquired secondary meaning is fact-intensive, and it is "impossible to lay down any generalized rule as to the minimum amount of distinctiveness necessary to achieve secondary meaning in a mark." 2 McCarthy § 15:28. Instead, each case should be taken on its facts. *Id.*

## C. No Reasonable Jury Could Have Found that the Marks Are Suggestive

■ VV Foods contends that no reasonable jury could have found that the "Cot" marks are suggestive.[3] "Cot" means "condensed," "concentrated," or "base," VV Foods says, and it therefore *describes* the soup base products at issue. (Everyone agrees that the other words in the "Cot" marks—for example, "pho bo," meaning

---

**3.** The Court expressed its view at trial that the marks were neither arbitrary nor generic, and that "the fight" was whether the marks were

suggestive or descriptive. (Reddy Decl. Exh. 10 at 62.) The parties adopted this paradigm in the briefing.

"beef pho soup," and "pho ga," meaning chicken pho soup—are descriptive.) Quoc Viet disagrees, arguing that "Cot" has a number of different meanings, including "bones of the dead," and that it is only suggestive of the condensed nature of Quoc Viet's products. The special verdict form did not ask the jury to state whether it determined the marks are descriptive or suggestive. The evidence presented at trial, however, would have only permitted a reasonable jury to find that the marks are descriptive. A jury simply could not have reasonably found that the marks are suggestive.

### 1. Language Expert Testimony

Quoc Viet's language expert, Dung Ngoc Tran, initially testified that "Cot" "means bones" and that the word cannot refer to food without a "head word." (Dkt. 270 ["Reddy Decl."] Exh. 5 at 42:9–17.) But on cross-examination, Mr. Tran admitted—twice—that "one of the meanings of the word Cot is condensed or concentrated." (*Id.* at 74:25–75:13.) He continued by explaining that a word can have many meanings, and that it is appropriate to look at "context" to "highlight the [correct] meaning." (*Id.* at 75:18–24.) If Mr. Tran were to see the word "Cot" in the context of food labeling—in connection with "sup chay," for example—he testified that he would "think that [it meant] condensed." (*Id.* at 75:25–76:5.)

VV Foods' language expert, Tyler Nguyen, agreed that the word "Cot" has many meanings, including "bones," "skeleton," "extract," "concentrate," and "base." (Reddy Decl. Exh. 8 at 72:20–73:1.) In the context of food products, however, Tyler Nguyen testified that "base, concentrate, or extract should be the most appropriate use of the term." (*Id.*) It would make "no sense" to understand "Cot" to mean "bone[s] of the dead" in the context of food, Tyler Nguyen explained, since another meaning of the word—"condensed" or

"base"—clearly pertains to condensed food products. (*Id.* at 74:1–6.) In his expert opinion, "Cot" conveys the meaning of "base" to purchasers of Quoc Viet's products, (*id.* at 75:22–76:1), and although there are other ways of rendering the meaning of "condensed" or "base" in Vietnamese, "Cot" is the most succinct way of doing so in the context of food, (*id.* at 104:5–23). Neither Dung Tran nor Tyler Nguyen produced any meaningful evidence that consumers would be required to exercise "imagination" or "multi-stage reasoning" to understand the meaning of "Cot" in the context of food labeling. (*See* Dkt. 227 at 22–23.) Mr. Tran did testify that he believed Quoc Viet might be playing a "game" with consumers by using a word with two meanings—one descriptive of the product ("condensed") and one not ("bones of the dead"). (Reddy Decl. Exh. 5 at 85:4–8.) (For his part, Tyler Nguyen thought this was "ridiculous." (*Id.* at 87:16–88:7).) But even accepting Dung Tran's theory that one meaning of "Cot" might have been perceived by customers as silly when attached to food products, the marks are still descriptive, since another meaning of "Cot" clearly describes the product without the need for multi-stage reasoning. If a company sells blue-colored umbrellas under the "Blue Umbrellas" mark, the mark is not suggestive merely because "blue" can also mean "melancholy" or "obscene." What matters is whether any meaning of a mark describes the product or not. It requires no imagination or mental leap to apply the right definition of a term, among several. Taken together, the language experts' testimony only supports one conclusion: that "Cot" describes the products at issue.

### 2. PTO Proceedings

 Quoc Viet's trademark prosecution before the PTO also compels the finding that the "Cot" marks are descriptive. Perhaps most significant in this regard is

the PTO's view that the "Cot" marks lack inherent distinctiveness. "Given [the difficulty] in determining whether a mark is descriptive or suggestive, courts have often given due regard to the determination of the Patent and Trademark Office, which necessarily decides whether a mark is descriptive or suggestive in its decision whether to register the mark." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 934 (4th Cir. 1995); *see also Lahoti*, 586 F.3d at 1199 ("Deference to the PTO's classification decision is sensible because the PTO has special expertise that [courts] lack on [the] fact-intensive issue [of whether a mark is descriptive or suggestive].") Here, Quoc Viet initially attempted to register some of its "Cot" marks with the PTO in 2003. As part of the initial application, Tuan Nguyen sent the PTO an email on behalf of Quoc Viet explaining that "Cot" meant "condensed or concentrated." (Reddy Decl. Exh. 1 at 92:2–93:19 (quoting the email from Tuan Nguyen to the PTO as reading, "Below is the translation of the [*sic*] 'Cot Pho Bo.' 'Cot' = condensed or concentrated; 'Pho' = Vietnamese rice noodle soup; 'Bo' = beef").) Elsewhere, the email stated that "Cot Pho Bo = Condensed or Concentrated Vietnamese Beef Rice Noodle Soup." (*Id.* at 93:15–19.) The PTO subsequently rejected registration of the "Cot" marks on the ground that they were "merely descriptive of the identified goods." (Reddy Decl. Exh. 2 at 42.) This determination, along with Tuan Nguyen's statement to the PTO that "Cot" means "condensed or concentrated," is highly probative evidence of descriptiveness.

Quoc Viet responded to the PTO's rejection of its marks by choosing to place them on the PTO's Supplemental Register. The Supplemental Register, Professor McCarthy explains, "is a listing of non-mark designations (such as descriptive words) that are only 'capable' of someday becoming a 'mark' upon the acquisition of secondary meaning." 3 McCarthy § 19:33. Unlike registration on the Principal Register, which confers a presumption of validity, supplemental registration "confers no benefits of validity beyond those gained at common law." *Id.* § 19:36. However, a registrant may subsequently apply to move its marks from the Supplemental Register to the Primary Register by filing an application under 15 U.S.C. § 1052(f) ("§ 2(f)") and arguing that its marks on the Supplemental Register have become distinctive through the acquisition of secondary meaning.[4] Under § 2(f), the PTO may accept "proof of substantially exclusive and continuous use" of a mark by the registrant for five years as "prima facie evidence that the mark has become distinctive." Quoc Viet placed six of the seven "Cot" marks on the Supplemental Register and ultimately moved five of those marks to the Principal Register through § 2(f) applications after five years of use.[5]

"An application for registration on the Supplemental Register is an implied admission that [a] term is not inherently distinctive," 3 McCarthy § 19:43, although a future factfinder is "not bound by the applicant's conclusions" on that question, *In re Hester Indus., Inc.*, 230 U.S.P.Q. 797, at *1 (T.T.A.B.1986).[6] Quoc Viet's

---

**4.** A registrant may also file an application under § 2(f) for marks that never appeared on the Supplemental Register.

**5.** The sixth mark, COT SÚP HEO, evidently remains on the Supplemental Register. The seventh mark, COT SÚP CHAY, never appeared on the Supplemental Register and was initially registered on the Principal Register

via a § 2(f) application. (Reddy Decl. Exh. 2 at 29–31.)

**6.** VV Foods incorrectly argues that the marks are descriptive *as a matter of law* because Quoc Viet chose to accept registration on the Supplemental Register. This is not so, since a trademark is "a common law property right that exists independently of statutory provi-

trademark attorney, Darren Rimer, testified that he believed Quoc Viet's marks to be suggestive, but that after the PTO rejected its applications for registration on the Principal Register, Quoc Viet "determined that it would be easier to accept a registration on the Supplemental Register" and subsequently seek registration on the Principal Register through § 2(f). (Reddy Decl. Exh. 2 at 16.) Such a course, Mr. Rimer explained, would save "a lot of time and money." (*Id.*) Choosing the easier administrative path did not estop Quoc Viet from arguing at trial that the marks are suggestive, but it does function as an implied admission that the marks were descriptive when they were placed on the Supplemental Register. *See* 3 McCarthy § 19:43 (commenting that while registration on the Supplemental Register may not "estop the applicant from proving ... in court" that a mark acquired secondary meaning pre-registration, it should count as an "admission against interest" that the mark is descriptive). And Mr. Rimer did nothing to dispel this admission at trial: he testified on cross-examination that "the fact that a mark is on the Supplemental Register means at one point it was descriptive," and that marks placed on the Supplemental Register were "descriptive in the past[, when] registered," both apparent admissions that the "Cot" marks were descriptive when placed on the Supplemental Register. (Reddy Decl. Exh. 2 at 25–26.)

Similarly, Quoc Viet's decision to seek registration on the Principal Register via a § 2(f) application is "tantamount to a concession of [the "Cot" marks'] non-distinctiveness." *See Gen. Foods Corp. v. Mgd Partners*, 224 U.S.P.Q. 479, at *6 (T.T.A.B. Sept. 28, 1984); *accord Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir.1994) (holding that "[t]he submission of evidence under Section 2(f) ... amounts to a concession that the mark sought to be registered is not inherently distinctive," and that marks so registered "cannot be inherently distinctive as a matter of law"). While not dispositive, a reasonable jury would have given this evidence significant weight, particularly when combined with the PTO's determination of non-distinctiveness, Tuan Nguyen's email to the PTO that defined "Cot" as "condensed or concentrated," and Quoc Viet's other registration activities, including electing placement on the Supplemental Register.

### 3. Limited Use

Quoc Viet only identifies one additional ground on which it says the jury might have reasonably concluded that the marks were suggestive: evidently Quoc Viet and VV Foods are the only two companies who use the word "Cot," alone, to describe condensed Vietnamese soup base. But, as VV Foods points out, there is no evidence in the record demonstrating that any companies besides the parties even *sell* condensed Vietnamese soup base, or that other Vietnamese soup bases are called something *other than* "Cot." Certainly the parties believe that they were the first to sell pho soup bases. (Dkt. 275-

---

sions for registration." *California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1454 (9th Cir.1985) (quoting *Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 926 (8th Cir.1967)). Registration (or failure to register) "neither expands nor diminishes common law rights," and a party who registers a trademark on the Supplemental Register does not "come[] away with fewer rights than it would have had if it had not sought registration at all."

*Id.* (holding that a party who sought registration on the Supplemental Register was not estopped from arguing at trial that its marks had achieved secondary meaning pre-registration). For the same reason, Quoc Viet's decision to seek registration on the Principal Register under 15 U.S.C. § 1052(f) ("Section 2(f)") did not estop it from arguing at trial that the marks are inherently distinctive.

1 ["Tran Decl"]. Exh. A at 14.) Contrary to Quoc Viet's assertions, the dearth of Vietnamese soup bases called "Cot" is not persuasive evidence that the "Cot" marks are suggestive.

In summary, there was abundant evidence in the trial record that the "Cot" marks are descriptive, including testimony from both parties' language experts, the PTO's determination, and the explicit concession made by Quoc Viet to the PTO that "Cot" means "condensed or concentrated." The trial record was absent of any persuasive evidence indicating that the "Cot" marks are suggestive or otherwise inherently distinctive.

## D. No Reasonable Jury Could Have Found that the Marks Acquired Secondary Meaning Before VV Foods' Initial Use

■ As the Court instructed the jury, Quoc Viet bore the burden of "proving by a preponderance of the evidence that the "Cot" marks had acquired secondary meaning before [VV Foods] began using the marks" if the marks were descriptive. Quoc Viet began using the "Cot" marks in January 2002. (Reddy Decl. Exh. 1 at 10–12; 14.) VV Foods began using the marks in "mid-2002." (*Id.* Exh. 6 at 36:19–23; *see also id.* at 72:15–25 (identifying "mid-September" as the date of the first sale and discussing an invoice from October 2002 mentioning products bearing the "Cot" marks).) Quoc Viet was therefore required to demonstrate that the "Cot" marks acquired secondary meaning during the relatively short timeframe between January and perhaps September—but no later than October—2002. No reasonable jury could have found that it did so.

### 1. Consumer Testimony

Quoc Viet argues that a reasonable jury could have found the existence of secondary meaning because numerous customers testified that they associated the "Cot" marks with Quoc Viet. (*See* Reddy Decl. Exh. 3 at 46–54 (Tony Doan) (describing purchases "going as far back as 2005 or earlier than 2005"); (*id.* Exh. 4 at 44 (Stuart Rushbrook) (describing purchases that began "in 2010"); *id.* Exh. 3 at 27 (Kim Do) (describing a business relationship that began in 2012); *id.* Exh. 4 at 20 (Bui Bich Ha) (describing a purchase "three or four years" before trial, i.e., roughly 2012); *id.* Exh. 3 at 58 (Xuan Lan Thi Nguyen) (not mentioning a particular time frame and expressing uncertain recollection of other dates).) The problem for Quoc Viet, however, is that none of this testimony specifically relates to the relevant time period: January through October of 2002. *No* witnesses presented by Quoc Viet testified that they primarily identified Quoc Viet as the source of goods bearing the "Cot" marks in 2002. And Quoc Viet presented no survey evidence, taken at any time, indicating that consumers associate the "Cot" marks primarily with Quoc Viet. *See Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir.1989) ("An expert survey of purchasers can provide the most persuasive evidence of secondary meaning."); *accord Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1333 n. 9 (8th Cir.1985) ("Consumer surveys are recognized by several circuits as the most direct and persuasive evidence of secondary meaning."); *see also Dep't of Parks and Recreation for State of California v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1128 (9th Cir.2006) (finding no secondary meaning in part because plaintiff presented "no consumer survey or other evidence of consumer opinion, beliefs, or associations"). As a result, Quoc Viet's consumer testimony does nothing to establish secondary meaning prior to VV Foods' initial use.

### 2. Advertising

■ Quoc Viet also presented evidence that it spent roughly $80,000 advertising

its "Cot" brand products between January 2002 and October 2002. (Tran Decl. Exh. A at 45.) Secondary meaning is commonly established through advertising, 2 McCarthy § 15:50, and "[e]vidence of the amount of money spent in promotion and advertising of the mark in issue is relevant to the issue of secondary meaning," *id.* § 15:51. However, "many cases" say that even extensive advertising alone does not create secondary meaning. *Id.*; *see also First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir.1987) (holding that "a large expenditure of money does not in itself create legally protectable rights" and that "[t]he test of secondary meaning is the effectiveness of the effort to create it"). As a result, the "nature, content and exposure of publicity and advertising is needed to determine how compelling is the logical inference that this advertising created a secondary meaning," since advertising expenditures are merely "a part of the total picture" of secondary meaning. 2 McCarthy § 15:52. Put differently, the advertising must not simply aim to promote the *goods* at issue; instead it should promote the *connection* between the mark and the source of the goods. *Parks and Recreation*, 448 F.3d 1118, 1128 (9th Cir.2006) (holding that the advertising must be "of a nature and extent such as to *create an association of the term with the user's goods*") (emphasis added). For that reason, courts reject even evidence of significant amounts of advertising is that advertising if not aimed at promoting some connection between a mark and a source of goods. *See, e.g., First Brands*, 809 F.2d at 1383 (in a trade dress case, affirming the district court's rejection of evidence of "millions of dollars in advertising" because the advertising campaign had not "stressed the color and shape" of the product at issue—an antifreeze jug—by, "for example, urging consumers to look for the 'familiar yellow jug'"); *Parks and Recreation*, 448 F.3d at 1128 (finding that a

descriptive mark had failed to acquire secondary meaning because there was "no evidence of any ... advertising or promotional efforts ... *designed to associate the marks with the [plaintiff's] services*") (emphasis added).

Here, the record is absent of evidence of advertising directed towards the creation of secondary meaning. Tuan Nguyen testified that he conducted a number of "demo roadshows" to exhibit his products in 2002, (Tran Decl. Exh. A at 38–39), serving samples to perhaps 50,000 people, (*id.* at 41). He also testified that Quoc Viet did "a lot of magazine, newspaper, TV, and [live talk] radio" advertising, although he does not describe the content or location of any of that advertising beyond saying that some of it informed people of the demo roadshows. And Tuan Nguyen conceded at trial that as late as June 2002, the "Cot" products were still "not known to the consumer" and that he was being told by supermarkets that if the "Cot" products did not sell within three months, they would be taken off the shelves. (Reddy Decl. Exh. 1 at 36–38.) None of this evidence even approaches the sort of focused advertising that might create the requisite association in consumers' minds. It does not prove secondary meaning.

### 3. Sales

Quoc Viet also proffered evidence that it sold approximately $100,000 in "Cot"-branded products in 2002, but this evidence fares no better than evidence of its advertising expenditures. As Professor McCarthy explains, "[p]opularity of a product is not synonymous with secondary meaning. Large sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark. To make popularity relevant as evidence, causation between the trademark and the popularity must be proved." 2 McCarthy § 15:43. The record indicates no

reason to believe that it was the "Cot" marks that were driving sales of Quoc Viet's products, as opposed to their novelty and utility, especially given Tuan Nguyen's testimony that there were *no* similar products on the market at the time. (Tran Decl. Exh. A at 14.)

### 4. Copying

 Quoc Viet also argues that the jury might reasonably have inferred secondary meaning because VV Foods deliberately copied its products and "Cot" marks. "[E]vidence of deliberate copying is relevant to a determination of secondary meaning," and "in appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844 (9th Cir.1987). Those circumstances, however, simply do not exist here. Admittedly, a reasonable jury could have found some level of copying, since VV Foods' principals were formerly associated with Quoc Viet. (Reddy Decl. Exh. A at 53–54.) But copying only supports an inference of secondary meaning when the copying is "intended to deceive or confuse the public." *Chrysler Corp v. Vanzant*, 44 F.Supp.2d 1062, 1081 (C.D.Cal.1999); *see also Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F.Supp.2d 1168, 1181 (N.D.Cal.2007) (holding that deliberate copying is only determinative when the record "necessarily establish[es] that the copying is intended to confuse customers and capitalize on the recognition of the plaintiff's product" and noting that "[c]ompetitors may intentionally copy product features for a variety of reasons"). Based on the trial record here, no reasonable jury could have inferred VV Foods' copying to mean that it was intending to confuse the public. There was no other evidence that the public even associated the "Cot" marks primarily with Quoc Viet in 2002. In other words, there was nothing for the public to be confused about, and Quoc Viet's evidence of direct copying cannot support an inference of secondary meaning within the limited relevant timeframe.

Moreover, as Professor McCarthy notes, not all copying is bad:

> There is absolutely nothing legally or morally reprehensible about exact copying of things in the public domain. For example, evidence that a junior user exactly copied unprotected descriptive, generic, or functional public domain words or shapes does not prove any legal or moral wrong(s).

4 McCarthy 23:122. The trial record reflects that Tuan Nguyen was the first to devise and produce a pho soup base. His initial success makes it entirely unsurprising that a competitor, VV Foods, chose to immediately follow suit, produce a similar product, and call it a similar (descriptive) name. What drove that copying was surely that people were *buying Quoc Viet's soup base*, not that people had so closely associated the "Cot" marks with Quoc Viet in a matter of months that VV Foods could capitalize off that association and copy Quoc Viet's still-barely-known products. Such a strained argument has no support in the evidentiary record, and no reasonable jury could have rendered a verdict based on it.

For these reasons, the Court concludes that Quoc Viet wholly failed to carry its burden of demonstrating by a preponderance of the evidence that its "Cot" marks had acquired secondary meaning before VV Foods' initial use. The time period in which Quoc Viet was required to prove secondary meaning was relatively short— January to October of 2002—and it was narrowed even further by Tuan Nguyen's admission that Quoc Viet's products were "unknown" to consumers in June 2002. Carefully considering all the evidence presented at trial, no reasonable jury could have concluded that the "Cot" marks in-

stantaneously gained secondary meaning between June and October of 2002; there was simply no credible evidence in the record to support such a conclusion. Accordingly, VV Foods has met the high standard of demonstrating that it is entitled to judgment as a matter of law on the issue whether the "Cot" marks had acquired secondary meaning before it initially began using the marks. The "Cot" marks are not protectable, and VV Foods is not liable for trademark infringement.

## III. CONCLUSION

For the foregoing reasons, VV Foods' motion for judgment as a matter of law is GRANTED.[7]

---

**7.** VV Foods' motion for a new trial, (Dkt. 271), is DENIED AS MOOT.