This Opinion is a
Precedent of the TTAB

Hearing: September 15, 2022                                        Mailed: May 25, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Seminole Tribe of Florida*

————

Serial No. 87890892

————

Miriam Richter of Richter Trademarks, P.L., for the Seminole Tribe of Florida.

Kathleen M. Schwarz, Trademark Examining Attorney, Law Office 123,
Kathy de Jonge, Trademark Examining Attorney, Law Office 107 (on brief),
    J. Leslie Bishop, Managing Attorney, Law Office 107.

————

Before Taylor, Greenbaum, and Johnson,
    Administrative Trademark Judges.

Opinion by Johnson, Administrative Trademark Judge:

The Seminole Tribe of Florida ("Applicant") seeks registration on the Principal

Register of the proposed mark shown below ("Applicant's Mark" or "Guitar Design")[1]

---

[1] Application Serial No. 87890892 was filed on April 24, 2018 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's allegation of a bona fide intent to use the mark in commerce. Thereafter, Applicant filed an Amendment to Allege Use of the mark in International Classes 41 and 43 based upon Applicant's claim of first use anywhere and first use in commerce since at least as early as October 24, 2019.

Citations to the appeal record are from the publicly available documents in TTABVUE, the Board's electronic docketing system. *See, e.g.*, *Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). The number preceding "TTABVUE" corresponds to the docket entry

for "Casinos," in International Class 41, and "Hotel, restaurant, and bar services," in International Class 43 (collectively, "Applicant's Services"). The mark is described as follows: "The mark consists of trade dress consisting of a three-dimensional building in the shape of a guitar." Color is not claimed as a feature of the mark.



---

number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry, if applicable. All citations to prosecution history documents contained in the Trademark Status and Document Retrieval (TSDR) database are to the downloadable .pdf versions of the documents.

The Examining Attorney refused registration of the mark on the ground that it is nondistinctive trade dress under Sections 1, 2, 3, and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, 1053, and 1127, and on a separate ground of failure to function as a service mark.[2] Applicant then requested reconsideration, arguing in the alternative that its mark had acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), and presenting evidence in support of its claim.[3] The Examining Attorney denied the request for reconsideration, maintaining the refusals and concluding that Applicant had not properly asserted a claim of acquired distinctiveness in the alternative.[4]

Applicant then filed its Appeal Brief, including an embedded request that "[a]t a minimum … the Board should vacate the refusal of the application and remand this matter for a proper evaluation of the configuration's inherent distinctiveness and, in the alternative, for consideration of Applicant's showing of secondary meaning under Section 2(f)."[5] (Applicant's Brief, 7 TTABVUE 18). The Examining Attorney

---

[2] Jan. 7, 2019 Final Office Action at 4-6.

[3] July 5, 2019 Request for Reconsideration after Final Action ("RFR") at 7-13 ("[S]hould the mark not proceed to registration based on inherent distinctiveness, and after the exhaustion of all appeals, Applicant wishes to introduce evidence of acquired distinctiveness.").

[4] Aug. 26, 2019 Subsequent Final Office Action – Request for Reconsideration Denied at 4; 5 TTABVUE 4.

[5] Applicant's embedded request that the Board "vacate the refusal" and remand this case for reconsideration of Applicant's acquired distinctiveness claim in the alternative, *see* 7 TTABVUE 18, is improper. *See also In re Adlon Brand Gmbh & Co. KG*, 120 USPQ2d 1717, 1725 (TTAB 2016) (applicant's request for remand, included in applicant's brief, denied, explaining that proper procedure "was to file with the Board, after the filing of the appeal but before briefing, a request for remand with a showing of good cause."); *cf.* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1205.01 (2022) (proper procedure is to file a separately captioned request for remand because requests embedded in

subsequently filed a request to remand the application solely to address Applicant's alternative claim of acquired distinctiveness,[6] which was objected to by Applicant.[7] The Board granted the request, restored jurisdiction to the Examining Attorney and suspended the appeal. (12 TTABVUE).

The Examining Attorney then issued an Office Action which maintained and continued the final refusals on both the grounds of failure to function and nondistinctive trade dress.[8] In addition, the Examining Attorney found Applicant's alternative acquired distinctiveness claim and supporting evidence insufficient in light of the intent-to-use application status, but allowed Applicant time to file additional evidence in support of its claim.[9] Applicant promptly filed an amendment to allege use with a specimen, shown below,[10] and renewed its claim of acquired

---

an appeal brief may not be noted by the Board). The purpose of requiring a separately filed request is to bring the request to the Board's attention in a timely manner before the briefs are filed. If warranted, Applicant should have requested, in a separate filing, remand of the case for consideration of additional evidence to support its claims. In any event, the application was remanded to the Examining Attorney, at her request, for consideration of Applicant's evidence of acquired distinctiveness.

[6] Jan. 15, 2020 Request for Remand at 1; 10 TTABVUE.

[7] In its response in opposition to the Examining Attorney's Request for Remand, Applicant argues that it "has been very clear that its request for a registration based on Section 2(f) was made in the alternative and only '*after the exhaustion of all appeals*' related to inherent distinctiveness … . Further … Applicant *has not waived*, and will not waive, its option to appeal the refusal of inherent distinctiveness, nor has it amended its application to Section 2(f)." Applicant's Objection to the Motion to Remand and Objection to Suspension of the Appeal during further Examination, 11 TTABVUE 3.

[8] Mar. 25, 2020 Office Action at 3.

[9] *Id.* at 2-3.

[10] Sept. 16, 2020 Amendment to Allege Use and specimen.

distinctiveness in the alternative in a subsequent office action response, which included additional supporting evidence.[11]





**SEMINOLE HARD ROCK HOLLYWOOD**

Seminole Hard Rock Hotel & Casino Hollywood unveiled a $1.5 billion expansion boasting more than 1,200 luxury guest rooms in three hotel towers, including the first-ever Guitar Hotel. Catch the biggest names in entertainment in the 7,000-capacity Hard Rock Live. Enjoy one of the integrated resort's many amenities including 18 acres of pools, a luxury spa and salon, dozens of contemporary and fine dining options, exciting bars and nightlife, an expanded gaming, and so much more.

**BOOK A ROOM NOW**

[12]

After further consideration, the Examining Attorney maintained the refusal to register Applicant's Mark on the ground that it is nondistinctive trade dress, reasoning that "[b]ecause buildings come in a vast array of shapes and sizes, and are

---

[11] Sept. 24, 2020 Response to Office Action ("ROA") at 1-21.

[12] Sept. 16, 2020 Specimen at 1 (cropped image from https://www.theseminolecasinos.com).

used to provide virtually all types of goods and services, consumers do not *inherently* perceive the exterior of an entire building as an immediate, inherent source indicator for the services provided inside the building."[13] However, as to Applicant's claim of acquired distinctiveness in the alternative, the Examining Attorney stated "[t]he §2(f) evidence is deemed acceptable and [acquired distinctiveness] will not be an issue on appeal."[14]

In her Appeal Brief, the Examining Attorney maintains that Applicant's Mark is not inherently distinctive, but accepts Applicant's claim of acquired distinctiveness in the alternative. (16 TTABVUE 8, 14). At the hearing, Applicant's counsel argued that Applicant's Mark is inherently distinctive. Since the Office has accepted Applicant's claim of acquired distinctiveness in the alternative, we address the final refusal solely on the ground that Applicant's Mark is not inherently distinctive. We reverse the refusal to register.

## I.    Evidentiary Issue

Before turning to the merits of the appeal, we address an evidentiary issue. Applicant attached to its Appeal Brief eleven third-party records for pending applications and registrations of design marks for buildings that are not included in

---

[13] Oct. 8, 2021 Final Office Action at 2. The October 8, 2021 Final Office Action was the second, and last, final office action; no subsequent office action issued. The Examining Attorney did not specifically maintain or discuss the separate failure to function refusal in the October 8, 2021 Final Office Action, so that refusal is forfeited. *See* TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 714.04 (July 2022) ("When making an action final, the examining attorney must restate any substantive refusals or requirements that remain outstanding, and must cite the rule(s) and/or statute(s) that provide the basis for these refusals or requirements.").

[14] Oct. 8, 2021 Final Office Action at 2.

the prosecution record (7 TTABVUE 20-39), and now requests that we take judicial notice of them. (7 TTABVUE 13 n. 2). The Examining Attorney objects to any consideration of this evidence, as it is untimely and because the Board does not take judicial notice of Office records. (16 TTABVUE 7).

Generally, "[t]he record in the application should be complete prior to the filing of an appeal. Evidence should not be filed with the Board after the filing of a notice of appeal." Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d); *see also* TBMP § 1203.02(e) ("Exhibits attached to a brief that were not made of record during examination are untimely, and generally will not be considered."); TBMP §§ 1203.01, 1207.01. Applicant provided no reason for an exception to this general rule, and we find no reason to deviate from established practice. Therefore, the evidence of third-party applications and registrations is untimely.

In addition, "[t]he Board's well-established practice is not to take judicial notice of third-party [applications and] registrations when an applicant or examining attorney requests that such notice be taken during the course of an appeal." TBMP § 1208.04; *see also In re House Beer, LLC*, 114 USPQ2d 1073, 1075 (TTAB 2015) (Board does not take judicial notice of files of applications or registrations residing in the Office, including entries in file of cited registration). Again, Applicant did not explain why we should deviate from this general rule, and we decline to do so.[15]

---

[15] To make the third-party applications and registrations of record, Applicant could and should have filed a separately captioned request for remand, including a showing of good cause, with the evidence attached. TBMP §§ 1207.02, 1209.04; *see also In re Ox Paperboard, LLC*, 2020 USPQ2d 10878, at *3-5 (TTAB 2020); *In re Adlon Brand*, 120 USPQ2d at 1725. Moreover, the cancelled registrations among the nine are not evidence of anything except

Accordingly, we sustain the objection. We will not consider further any of the eleven records Applicant attached to its Appeal Brief.

## II. Applicant's Mark and Inherent Distinctiveness

Section 45 of the Trademark Act defines a "service mark," in relevant part, as "any word, name, symbol, or device, or any combination thereof used by a person . . . to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if the source is unknown." 15 U.S.C. § 1127. "The critical inquiry in determining whether a designation functions as a mark is how the designation would be perceived by the relevant public." *In re Eagle Crest Inc.*, 96 USPQ2d 1227, 1229 (TTAB 2010). "[A] mark is inherently distinctive if '[its] intrinsic nature serves to identify a particular source.'" *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 54 USPQ2d 1065, 1068 (2000) ("*Samara Bros.*") (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 23 USPQ2d 1081, 1083 (1992) ("*Two Pesos*")).

---

that the registrations issued; they are not evidence of any presently existing rights in the marks shown in the registration, nor are they evidence that the marks were ever used. *Action Temp. Servs. v. Labor Force, Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1309 (Fed. Cir. 1989); *A&H Sportswear Co. v. Yedor*, 2019 USPQ2d 111513, at \*5 n.4 (TTAB 2019) ("a cancelled registration is not entitled to any of the statutory presumptions of Section 7(b) of the Trademark Act"); *Kemi Organics, LLC v. Gupta*, 126 USPQ2d 1601, 1606 (TTAB 2018) (a cancelled registration is only evidence that the registration issued, and is not evidence of use of the mark at any time). With respect to the two application records, third-party applications are evidence only of the fact that they have been filed, *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1270 n.8 (TTAB 2009), and have no other probative value. *Interpayment Servs. Ltd. v. Docters & Thiede*, 66 USPQ2d 1463, 1468 n.6 (TTAB 2003).

### A. Inherent Distinctiveness and Trade Dress: Supreme Court Case Law

Throughout the briefs and during oral argument, Applicant and the Examining Attorney discussed, at length, the applicability of two United States Supreme Court decisions focusing on whether trade dress can be inherently distinctive: *Two Pesos* and *Samara Bros.* We summarize the pertinent portions of each case below.

1. *Two Pesos, Inc. v. Taco Cabana, Inc.*

Throughout the late 1970s and 1980s, Taco Cabana, Inc. operated a chain of fast-food restaurants that served Mexican cuisine in the San Antonio, Houston, Austin, Dallas, and El Paso, Texas areas. In trade dress infringement litigation against Two Pesos, Inc., which operated Mexican restaurants with a similar motif in the cities of Houston, Dallas, and El Paso, Taco Cabana described the trade dress featured at its restaurants as

> a festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme.

*Two Pesos,* 23 USPQ2d at 1082.

At trial, the jury returned a verdict finding that Taco Cabana's trade dress was nonfunctional and inherently distinctive, but "[had] not acquired a secondary meaning." 23 USPQ2d at 1082. On appeal, the U.S. Court of Appeals for the Fifth Circuit held that the law and evidence supported the jury's findings, and that under Fifth Circuit precedent, "trademark law requires a demonstration of [acquired

distinctiveness] only when the claimed trademark is not sufficiently distinctive of itself to identify the producer … [and] that the same principles should apply to protection of trade dresses." 23 USPQ2d at 1083. The U.S. Supreme Court affirmed the circuit court, holding that "proof of secondary meaning is not required to prevail on a claim under § 43(a) of the Lanham Act where the trade dress at issue is inherently distinctive…." 23 USPQ2d at 1086. Overall, at trial and on appeal, Taco Cabana's restaurant trade dress, as described, was found to be inherently distinctive, and therefore registrable without a showing of acquired distinctiveness.

2.      *Wal-Mart Stores v. Samara Bros.*

Eight years later, in *Samara Bros.*, the Supreme Court opined further about trade dress, distinguishing "product design" trade dress from "product packaging" trade dress. In that case, Samara Brothers, Inc., a designer and manufacturer of children's clothing, sued Wal-Mart for selling knockoffs of Samara Brothers' garments, specifically, a line of spring and summer one-piece seersucker outfits featuring "appliques [sic] of hearts, flowers, fruits, and the like." 54 USPQ2d at 1066.

The Court, finding that the seersucker outfits sold by Samara Brothers constituted "product design" trade dress, held that "in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." 54 USPQ2d at 1070. Justice Scalia, writing for a unanimous Court, distinguished the "product packaging" trade dress, or "*tertium quid,*" at issue in *Two Pesos*, from the "product design" trade dress at issue in *Samara Bros.*

> *Two Pesos* unquestionably establishes the legal principle that trade dress can be inherently distinctive, … but it does not establish that *product-design* trade dress can be. **Two Pesos is inapposite to our holding here because the trade dress at issue [in *Two Pesos*], the décor of a restaurant, seems to us not to constitute product** *design.* **It was either product packaging — which, as we have discussed, normally** *is* **taken by the consumer to indicate origin — or else some** *tertium quid* **that is akin to product packaging and has no bearing on the present case.**

54 USPQ2d at 1069 (citations omitted) (italics in original; emphasis added). Justice

Scalia further elucidated the difference between "product packaging" trade dress and

"product design" trade dress as follows:

> It seems to us that [product] design, like color, is not inherently distinctive. **The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of encasing it in a distinctive packaging, is most often to identify the source of the product. Although the words and packaging can serve subsidiary functions … their predominant function remains source identification. Consumers are therefore predisposed to regard those symbols as indication of the producer, which is why such symbols "almost** *automatically* **tell a customer that they refer to a brand," … and "immediately … signal a brand or a product source.** And where it is not reasonable to assume consumer predisposition to take an affixed word or packaging as indication of source — where, for example, the affixed word is descriptive of the product ("Tasty" bread) or of a geographic origin ("Georgia" peaches) — inherent distinctiveness will not be found.
>
> …
>
> In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs — such as a cocktail shaker shaped like a

> penguin — is intended not to identify the source, but to render the product itself more useful or more appealing.

54 USPQ2d at 1069 (citations omitted) (italics in original; emphasis added).

Finally, in "close cases," where courts will be forced to "draw difficult lines between product-design and product-packaging trade dress," Justice Scalia stated that "courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." 54 USPQ2d at 1070.

## B. Applicant's Guitar Design Mark Is Inherently Distinctive for Applicant's Services

Applicant contends that its mark is akin to product packaging and not product design: "The Application is for services, and the building is the 'package' in which the services are delivered to consumers. That the building was 'designed' … does not make it a 'product design' … ." (7 TTABVUE 18). In support, Applicant argues that the Board already "confirmed the ability of a building's façade alone to function as a trademark" in the nonprecedential Board decision *In re Furniture Mart Holdings I, LLC*, 2012 WL 4361420 (TTAB Sept. 12, 2012) ("*Furniture Mart I*").[16] (7 TTABVUE 18). Applicant also included in the record nineteen third-party

---

[16] An opinion designated as not precedential is not binding upon the Board, but may be cited for whatever persuasive value it might have. TBMP §§ 101.03, 1203.02(f). Generally, the practice of citing non-precedential opinions is not encouraged. *In re Morrison & Foerster LLP*, 110 USPQ2d 1423, 1427 n.6 (TTAB 2014); *In re the Procter & Gamble Co.*, 105 USPQ2d 1119, 1120-21 (TTAB 2012). More importantly, we find that *Furniture Mart I* has no persuasive value here, because it turned on the failure of the examining attorney to make a *prima facie* showing that the building design sought to be registered was not inherently distinctive.

registrations of building configurations or building designs from the TSDR database, one of which is cancelled, that issued without claims of acquired distinctiveness.[17]

The Examining Attorney contends that Applicant's Mark is not inherently distinctive product packaging, but is nondistinctive, ambiguous trade dress (similar to that discussed in *Samara Bros.*), and therefore, acquired distinctiveness is required before registration can be granted. (16 TTABVUE 13). The Examining Attorney particularly argues that "[w]hen used with services, trade dress typically consists of three-dimensional matter or visual elements that form or otherwise affect the 'packaging' of the services, i.e., the image or appearance of the location where, or the means by which, the services are performed," (16 TTABVUE 9), but that Applicant's Mark "is not inherently distinctive because it is a mere refinement of the exterior of a building." (16 TTABVUE 11). In other words, consumers would recognize the features of Applicant's building as "basic, common elements" that are common to

---

[17] Nov. 7, 2018 ROA at 92-1779 (Reg. Nos. 1865062, 1865063, 1865064, 1865065, 2775235, 2773451, 2280290, 4864166, 2295898, 5457612, 2263968, 3917411, 3917413, 3917412, 5193737, 5426520, 1970427, 3830869, and 4765905). Reg. No. 4765905 is cancelled, and accordingly, has no probative value. We are unpersuaded by Applicant's third-party registration evidence. We must consider the eligibility for registration of Applicant's Mark for the identified services based on the record in this case. *See In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016) ("The PTO is required to examine all trademark applications for compliance with each and every eligibility requirement...."); *In re Shinnecock Smoke Shop*, 571 F.3d 1171, 91 USPQ2d 1218, 1221 (Fed. Cir. 2009) ("Applicant's allegations regarding similar marks are irrelevant because each application must be considered on its own merits."); *In re Nett Designs, Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) ("Even if some prior registrations had some characteristics similar to [the instant] … application, the [US]PTO's allowance of such prior registrations does not bind the Board … ."). Each case is decided on its own facts, and each mark stands on its own merits. *In re USA Warriors Ice Hockey Program, Inc.*, 122 USPQ2d 1790, 1793 n.10 (TTAB 2017) (quoting *In re Boulevard Entm't*, 334 F.3d 1336, 67 USPQ2d 1475, 1480 (Fed. Cir. 2003)).

all buildings, not as indicators of source. (16 TTABVUE 11). The Examining Attorney further argues that Applicant's Mark "would not be *inherently* perceived as a source indicator for the identified services because the purpose of a building is other than to indicate source." (16 TTABVUE 11; *see also* 16 TTABVUE 12 ("inherent purpose of a building is to provide shelter, not to indicate source")).

We appreciate that buildings come in all shapes and sizes and have common elements, as demonstrated by the evidence of record,[18] but we decline to adopt either the Examining Attorney's argument or Applicant's argument. Instead of focusing on decisions only involving the trade dress of buildings and the services rendered in those buildings, we also find pertinent decisions that analyze the inherent distinctiveness of trade dress used with a variety of services. *Cf. In re Berkeley Lights, Inc.*, 2022 USPQ2d 1000, at *18-21 (TTAB 2022) (Board may rely on "a different rationale" unless it "rises to the level of a new ground for refusal"); *In re Peace Love World Live, LLC*, 127 USPQ2d 1400, 1401-02 (TTAB 2018) (Board exercised discretion to limit its review of failure to function refusal to whether I LOVE YOU was merely ornamental); *In re Avocet, Inc.*, 227 USPQ 566, 567 (TTAB 1985) (Board need not adopt arguments of applicant or examining attorney "in every respect" in order to render a decision on appeal); *see also* TBMP § 1217.

For example, in a decision evaluating the distinctiveness of the "Cuffs & Collar" trade dress worn by the Chippendales dancers, the Office asserted a somewhat analogous argument to the one it asserts here, focusing on the presumed similarity

---

[18] *See* May 7, 2018 Office Action at 6-14; Jan. 7, 2019 Office Action at 12-79.

of attire worn by exotic dancers: Specifically, the "Chippendales' mark [was] not inherently distinctive simply because exotic dancers [were] expected to wear revealing attire." *In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1688 (Fed. Cir. 2010). Although the Federal Circuit affirmed the Board's ultimate conclusion finding the "Cuffs & Collar" trade dress not inherently distinctive in the exotic dancing field "because it was inspired by the ubiquitous Playboy bunny suit," *id.* at 1683, the court also found that "the Board erred in suggesting that **any** costume in the context of the adult entertainment industry would lack inherent distinctiveness … ." *Id.* (emphasis added). The court opined further that an inherent distinctiveness inquiry, as applied to trade dress, does not depend on actual consumer identification of a particular trade dress with a particular business:

> Inherent distinctiveness [of trade dress] does not depend on a showing that consumers *actually* identify the particular mark with the particular business; this is a question of acquired distinctiveness, or secondary meaning. As we elaborated in *Tone Brothers, Inc. v. Sysco Corp.*, 28 F.3d 1192 [31 USPQ2d 1321] (Fed. Cir. 1994), ultimately **"the focus of the [inherent distinctiveness] inquiry is whether or not the trade dress is of such a design that a buyer will immediately rely on it to differentiate the product from those of competing manufacturers; if so, it is inherently distinctive."** *Id.* at 1206 (citing *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 582-84 [27 USPQ2d 1189, 1191-94] (2d Cir. 1993)). Thus, if the mark is inherently distinctive, it is presumed that consumers will view it as a source identifier. **If the mark is not inherently distinctive, it is unfair to others in the industry to allow what is in essence in the public domain to be registered and appropriated, absent a showing of secondary meaning.** The policy here is basically the same as the prohibition against registering

> generic word marks, or descriptive marks that have not acquired secondary meaning.

*In re Chippendales USA*, 96 USPQ2d at 1685 (italics in original; emphasis added).

*In re Chippendales USA*, which was decided after both *Two Pesos* and *Samara Bros.*, indicates that it is appropriate for us to consider whether a consumer would immediately rely on Applicant's Guitar Design mark to differentiate Applicant's Services from the services of others who offer casinos or hotel, restaurant, and bar services, as well as to consider the entire trade dress of Applicant's Guitar Design mark as shown and described above. *In re Chippendales USA*, however, does not require us to consider the general purpose of the building to which the trade dress is applied.

*In re Chippendales USA* set the stage for the Board to find the "fanciful, prehistoric animal design" of the cab of a monster truck, used to compete in monster truck exhibitions, akin to product packaging for an applicant's monster truck services, and therefore, inherently distinctive. *In re Frankish Enters. Ltd.*, 113 USPQ2d 1964, 1970 (TTAB 2015). Of particular importance to the Board in *In re Frankish Enterprises* was the uniqueness of the applicant's monster truck design, which was readily distinguishable from **all other** monster truck designs of record:

> Here, the evidence made of record by the Examining Attorney fails to show that Applicant's "fanciful, prehistoric animal" design is either a common or a basic shape or design. Rather, it is unique among the more than 100 monster trucks depicted in the Examining Attorney's image search results. To the extent that two of the monster trucks among those results have certain characteristics in common with Applicant's mark, they are nevertheless

> **readily distinguishable** from Applicant's unique design which includes peculiar horns, scales, a protective shield and other features which neither Swamp Thing nor the "Raptors" monster trucks share. **Indeed, Applicant's monster truck is "unique" and "unusual" in the monster truck field. The Examining Attorney provided scant, if any, evidence that Applicant's truck is a "mere refinement" of anything, let alone a "commonly-adopted" and "well-known form" in the monster truck field. To the contrary, the totality of the record makes clear that Applicant's truck stands alone in the quality and quantity of its distinctive traits which set it apart from the other monster trucks about which the Examining Attorney submitted evidence … .**

113 USPQ2d at 1971 (emphasis added).

We find, on the record in this case and under the guidance of *Two Pesos*, *Samara Bros.*, and *In re Chippendales USA*, that Applicant's Guitar Design is "*tertium quid*" that is akin to product packaging, and that Applicant's Guitar Design is inherently distinctive for Applicant's Services. In making this finding, we apply the Board's reasoning in *In re Frankish Enterprises,* which as highlighted above, focused on the uniqueness of the trade dress at issue in the relevant industry. *See also In re Eagle Fence Rentals, Inc.*, 231 USPQ 228 (TTAB 1986) ("alternately colored strands of wire arranged vertically in fencing" for renting chain link fencing found inherently distinctive; refusal reversed); *In re Red Robin Enters., Inc.*, 222 USPQ 911 (TTAB 1984) (particular design of applicant's bird costume found inherently distinctive for "entertainment services, namely, personal appearances, clowning, antics, dance routines, and charity benefits"; refusal reversed).

Our finding is further supported by the long-standing test to determine whether trade dress is inherently distinctive, articulated in *Seabrook Foods, Inc. v. Bar-Well*

*Foods, Ltd.*, 568 F.2d 1342, 196 USPQ 289, 291 (CCPA 1977): whether the trade dress is a "common" basic shape or design; whether it is unique or unusual in a particular field; or whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods.[19]

Applicant seeks registration of its trade dress for its casinos and hotel, restaurant, and bar services, but the record in this case lacks any evidence demonstrating that a building designed in the shape of a guitar, shown again below, is a common design through which casinos, or hotel, restaurant, and bar services are offered. *See In re Frankish Enters.*, 113 USPQ2d at 1971. Indeed, the record is devoid of any evidence showing that anyone in the United States other than Applicant has adopted a "guitar design" trade dress for a building — there are no others. *Cf. id.* ("the totality of the record makes clear that Applicant's truck stands alone in the quality and quantity of its distinctive traits which set it apart from the other monster trucks about which the Examining Attorney submitted evidence … .").

---

[19] Here, as in *In re Chippendales USA*, under our facts — i.e., a mark with no textual elements — "[t]he fourth factor, whether the trade dress was capable of creating a commercial impression distinct from the accompanying words, is not applicable. …" 96 USPQ2d at 1684 ("If a mark satisfies any of the first three tests, it is not inherently distinctive.").



[20]

We find that Applicant's Mark is not a common design; rather, it is unique, and not a mere refinement of a commonly-adopted and well-known form of ornamentation for Applicant's Services. Given the uniqueness of Applicant's three-dimensional Guitar Design trade dress as applied to Applicant's Services, we find Applicant's Mark is of a type that consumers would immediately rely on to differentiate Applicant's Services from casinos or hotel, restaurant, and bar services offered by others, and that it therefore constitutes inherently distinctive trade dress.

---

[20] Sept. 16, 2020 Specimen at 1 (cropped image from https://www.theseminolecasinos.com).

## III.    Conclusion

In sum, we find Applicant's Mark to be inherently distinctive for Applicant's Services. Accordingly, the application will proceed to registration without a claim of acquired distinctiveness.[21]

**Decision**: The refusal to register on the ground that Applicant's Mark is not inherently distinctive is reversed.

---

[21] As previously discussed, the Office has already accepted Applicant's alternative 2(f) claim, based on the evidence Applicant proffered during prosecution. This decision renders that acceptance moot.